Ignatius F. O'Ferrall *vs.* Charles M. Colby;

—A N D—

O. B. Bryant *vs.* The Same.

MOTIONS FOR PEREMPTORY WRITS OF MANDAMUS, &C.

Under Sec. 33, Chap. V. page 50 Revised Statutes of Minnesota, the duties of the Clerk of the Board of Supervisors in receiving and opening election returns, in canvassing and estimating the votes, and in giving certificates of election, are purely ministerial; and no judicial or discretionary powers are conferred on him or on the Board of Canvassers, except, perhaps, so far as to determine whether the returns are spurious or genuine, or polled at established precincts, and in ascertaining from the returns themselves for whom the votes were intended.

The Supreme Court cannot decide upon the right of a party to hold a seat in the Legislature, each house being the judge of the qualification of its own members; but it may compel the respective State and County officers to arm the parties entitled, with the credentials necessary to assert their rights before the proper tribunal. But the award of a certificate of election to either candidate under the mandate of this Court, will not determine his election.

All the facts in these cases appear in the Opinion of the Court.

The following are the points and authorities presented by Counsel for the Petitioner:

*First.* The Supreme Court has original jurisdiction to issue the writ. *Constitution,* Art. VI. Sec. 2; *R. S.,* Sec. 5, p. 286.

*Second.* The writ of Mandamus is the proper remedy. 3 *Black. Com.,* 110; *Jacob's Law Dic.* vol. 4, p. 223; *People vs. Steele,* 2 *Barb,* 418.

*Third.* The Clerk of the Board of County Supervisors is the mere minister of the law. It is made his *duty* to issue a certificate to the person having the highest number of votes as appears from the returns, and he has no judgment or discretion in the premises. Vide *Rev. Stat.* sec. 33, p. 50; *ib.* p. 63; *People vs. Sup'vsrs of Chenango Co.,* 4 *Seld.* 317; *Rev. Stat. N. Y.,* 4th *Ed.* vol. 1, p. 351; 4 *Cowen,* 297; *Rev. Stat. Ind.* 264; 2 *Carter,* 423.

*Fourth.* The Clerk, in this instance, has usurped the Constitutional authority given to each house of the Legislature, of adjudging upon election returns and of the eligibility of its members. His duty is to furnish the applicant with his credentials, or the evidence *prima facie* to assert his claim before the proper tribunal. It determines nothing in regard to his election or eligibility. *Brown vs. O'Brien,* 2 *Carter's (Ind. Rep.* 423.

*Fifth.* That certificates have been issued in confessed violation of law, cannot affect the right of the Petitioners to have them issued in accordance with the law. An act nugatory and unlawful is no excuse for the non-performance of a duty imposed by law. Vide 4 *Selden,* case before cited.

The following are the points and authorities presented by Counsel for Respondent:

A mandamus will not be issued unless the party against whom it is sought has refused to perform his duty. 3 *Ad. and Ellis,* 217; *id.* 477; 4 *Nev. and Man.* 871.

The duties of the Board of Canvassers are not merely ministerial; and their discretion cannot be controlled or revised. *Rev. Stat.* sec. 33, p. 50; *id.* sec. 43, p. 52; *id.* sec. 49, p. 53; *Sess. Laws* 1856, 10; 6 *Texas,* 457.

A mere ministerial act performed cannot be reviewed or revised by Mandamus.

To entitle a party to a writ of Mandamus, he must show a present legal obligation or duty on the part of the person to whom it is to be directed to do the act sought to be done, and that he has yet a legal power or right to perform. 12 *Barb.* 217; 6 *Texas,* 457; 15 *Barb.* 607.

There is no present obligation upon the part of the Defendant to issue second certificates of election, and he has no legal right or power to do so.

Mandamus does not lie to admit a person to an office in which there is another under *prima facia* title, by color of right; *quo warranto* is the proper remedy. 3 *Johns. cases,* 79; 7 *Geo.* 473; 10 *Miss.* 117.

Mandamus will not lie where there is another remedy. 6 *Hill,* 244; 2 *id.* 45; 7 *Ohio State Rep.* 450; *Rev. Stat.* 423, sec. 5.

The applicant has another "plain, speedy and adequate" remedy. *Constitution,* Art. IV. Sec. 3.

If any writ should be allowed, it should be an alternative.

McMahon & Jones and Brisbin & Bigelow, Counsel for Petitioner.

D. S. Norton, Counsel for Respondent.

*By the Court*—L. EMMETT, J.   These were separate motions for peremptory writs of Mandamus, to compel the Defendant as the Clerk of the Board of Supervisors of Fillmore county to give to the Plaintiffs certificates of their election to the State Senate from said county.   The applications were made in the first instance to Justice Flandrau, who directed the motions to be made at the present Term upon notice to the Defendant. They both depend upon *the same* facts, and were argued and submitted together.   The moving papers show that at the General election held on the 12th day of October, A. D. 1858, two Senators were to be elected from the county of Fillmore. That the Plaintiffs O'Ferral and Bryant, and H. W. Holley, and R. Wells, were respectively candidates for the office of State Senator, and were the only persons for whom votes were cast at said election for said office.   That the returns of said election, from each of the several election precincts of said county were duly made to the Defendant, as the Clerk of the Board of Supervisors of said county.   That after the receipt of all of the returns from the several election precincts, the Defendant, in his official capacity as Clerk of the said Board of Supervisors, and within the time prescribed by law, taking to his assistance two Justices of the Peace of said county proceeded to open said returns and make abstracts of the votes, and that by said returns, the Plaintiffs respectively had a greater number of votes for said office than either of the other persons voted for. But that the Defendant as such Clerk, refused to include in his estimate of the votes, the returns received from the town of Chatfield, a legally constituted election precinct of said county, although the same were duly received by him, and opened in the presence of said Justices of the Peace, and refused to give to the Plaintiffs respectively, certificates of their election to said office; and that the Defendant still has in his possession and under his control all the election returns from said county, by which he is still enabled to give certificates of election to each of the persons having the highest number of votes.

The affidavit of the Defendant in opposition to these motions, does not embrace any of these facts, nor indeed any material fact alleged in the papers read on the part of the Plaintiffs. He admits that he is now, and ever since said election has been

Clerk of the Board of Supervisors of Fillmore county, and that as such Clerk he received the returns of said election, from all of the precincts in said county. He alleges that on the 25th day of October, A. D. 1858, he called to his assistance two Justices of the Peace of said county and proceeded to open the returns of said election, and to make abstracts of the votes therein contained. That they opened all of said returns and then and there made an abstract of all the *legal* votes; a true copy of which abstract is attached to the moving papers. He then avers that it became his duty to give certificates of election to the several persons, who appeared, *by such abstracts*, to have the highest number of votes, and that accordingly he did, immediately give to the said H. W. Holley and the said R. Wells each, a certificate of election to the office of State Senator for said county of Fillmore, they having the highest number of votes, as appeared by said *abstract*. And in conclusion he denies that the Plaintiffs were duly elected at said election. He does not however, deny that he refused to include in the estimate of votes cast at said election, the returns of the election held in the Chatfield precinct; nor that the plaintiffs had respectively, the greatest number of votes, by the returns made and received from established precincts; nor that he refused to give them certificates of election; nor that all of said returns are still in his possession as such Clerk, and under his control. He confines himself strictly to a denial of conclusions of law.

The abstract referred to, shows that the said Holley received 987 votes, and that the said Wells received 994 votes, and that the Plaintiff, O'Ferrall received 900 votes, and the Plaintiff Bryant 901 votes, all for State Senator. The returns from Chatfield, as certified to by the Defendant in his official capacity, show that, at the election held in that precinct Holley received 89 votes, Wells 85 votes, the Plaintiff O'Ferrall 206 votes, and the Plaintiff Bryant 191 votes for State Senator. Had the votes in the returns from the Chatfield precinct been included in the estimate, the number for each candidate would have corresponded with the number which the Plaintiff's claim each to have received, and the Plaintiff's would then have been entitled to certificates of election, as the persons having the greatest number of votes for Senator. But the re-

turns from the Chatfield precinct were not included in the abstract and the Defendant, refusing to consider any votes not estimated in making out the abstract, gave certificates of election to the said Holley and Wells : Whether he had any discretion in the premises is the material question for consideration.

The genuineness of the returns from the Chatfield precinct is not denied, nor does it appear in the case, why they were not included in the estimate of votes; but we infer from the arguments of counsel, and the denial by the Defendant that the Plaintiffs were *duly* elected, and his averment that all the legal votes cast at said election were canvassed; that these returns were excluded because in the opinion of the Board of Canvassers, they contained illegal votes. We hold however, that neither the Board of Canvassers, nor the Clerk of the Board of Supervisors has any thing to do with the question as to whether any returns received by said Clerk from established precincts contain illegal votes. The Statute has provided for the election of Judges to superintend the voting at each precinct, whose sworn duty it is to guard the polls against illegal voting. The right to challenge votes is given to all. The voter if challenged must take the oath prescribed, and after that even the judges of election may refuse to receive his vote, if they are satisfied from other evidence that he is not a legal voter. After the polls are closed the Judges of election must publicly canvass the votes received, and the law directs how the list shall be purged of any excess of ballots. It is but reasonable to presume that these Judges, acting under the solemnities of an oath, and being present and seeing, and if required examining under oath all persons voting, are better qualified to judge of the legality of the votes given than the Clerk of the Board of Supervisors, or the two Justices called to his assistance, who know nothing of the facts involved, and have no power as a Board, to send for persons or papers, or to examine or compel the attendance of witnesses, and who are neither sworn to these particular duties, nor are they required by law to perform these duties in public.

We do not believe that a Board thus constituted, selected by one man alone, and acting perhaps in secret, has any power to

O'Ferrall *v.* Colby, and Bryant *v.* Colby.

revise the action of the Judges of election, who are elected with greater care, have more extended powers, and who act publicly, under the solemn obligations of an oath. If the Judges of election have failed to perform their duty, or have decided erroneously in any essential particular, the constitution and laws have provided an ample remedy, either by contest before the Legislature, each branch of which is the judge of the election and eligibility of its members; or by application to the Courts, where all matters can be fully investigated, and the parties have compulsory process for witnesses.

After the judges of election have performed their duty, and forwarded the returns to the Clerk of the Board of Supervisors, the said Clerk, on the twentieth day after the election, or sooner, if all the returns be received, taking to his assistance two Justices of the Peace of his county, must proceed to open the returns and make abstracts of the votes; placing all the votes for members of the Legislature on one sheet, and the votes for county and precinct officers on another, and it is then made the duty of *the Clerk* immediately to make out a certificate of election to each of the persons having the highest number of votes for the Legislature, county and precinct officers respectively, and to deliver said certificates to the persons entitled thereto, on their making application to the Clerk at his office. *Sec. 33, Chap. 5, p. 50, R. S.*

This duty of the Clerk, the Plaintiffs contend is ministerial only, and consists merely in footing up the votes returned to him from established precincts, and in making out certificates in accordance therewith. In the State of Indiana, under a Statute identical in substance with Sec. 33, above referred to, the Supreme Court in the case of *Brown vs. O'Bryan*, 2 *Carter*, 423, held and decided: " That the duties of the Board of Canvassers and the Clerk in making out the statement of the votes given, the persons elected, &c., are purely ministerial. That it is not within their province to consider or determine any question relative to the validity of the election held, or the votes received by the persons voted for. That they are simply to cast up the votes given for each person, from the proper election documents, and to declare the person who, upon the face of these documents, appears to have received

the highest number of the votes given, duly elected to the office voted for." A similar decision as to the character of these duties, is found in 4 *Cowen* 297, where the Court decides that the duties of the Board are ministerial and not judicial, and is also implied in the decision of the case of the *People vs. Supervisors of Chenango County*, 4 *Selden*, 317.

But whatever doubts might have existed as to the interpretation of Sec. 33, standing alone, we think they are all dissipated by an examination of Sec. 43 of the same Chapter, which is as follows: "Sec. 43. No election returns shall be refused by any Clerk of the Board of County Commissioners (Supervisors,) for the reason that the same may be returned or delivered to him in any other than the manner directed in this Chapter, nor shall he refuse to include any returns in his estimate of the votes, for any informality in holding any election, or making returns thereof, but *all returns shall be received*, and the votes canvassed by such Clerk, and a certificate given to the person who may, *by such returns*, have the greatest number of votes."

It would be difficult to find language that would more clearly express an intention on the part of the Legislature to refuse to the Clerk of the Board of Supervisors any discretion in receiving or canvassing election returns, or in estimating the votes, or in giving certificates of election; or language more appropriate to render his duties ministerial merely. It is not only provided that he shall receive and canvass *all* election returns made to him, and include *all*, however informal, in his estimates of votes, but he is expressly directed to give certificates of election to the persons who may, not by any abstract, but by such returns, have the greatest number of votes. Language could not be more explicit. Especial care seems to have been taken that he shall omit nothing, for he is not only required to receive all, but to open and canvass them; not to canvass only, but to include all election returns in his estimate of the votes; and as if this were not sufficient, he is still further required to recur again to the returns, and give certificates of election to the persons who appear by them to have the greatest number of votes. We cannot therefore resist the conclusion, that the duties of the Clerk of the Board of Super-

visors in receiving and opening election returns, in canvassing and estimating the votes, and in giving certificates of election, are purely ministerial, and that no judicial or discretionary powers are conferred upon him, or the Board of Canvassers, except perhaps so far as to determine whether the returns are spurious or genuine, or polled at established precincts, and in ascertaining from the returns themselves, for whom the votes were intended.

Great confidence is expressed by the defence, in the decision of the Supreme Court of Texas, in the case of *Arberry vs. Beavers, 6 Texas Rep.* 457.

The proceeding was by Mandamus to compel Arberry, who was Chief Justice of the County, to receive and count certain votes given at an election held for the purpose of locating the seat of justice of the county. The returns were to be made to him, and he refused to *receive* or *count* the votes from some six or seven precincts. The majority of the Judges of the Supreme Court held that the statute conferred upon the Chief Justice a personal trust, distinct from his ordinary official duties, and that in receiving and estimating the returns he did not act in a merely ministerial capacity ; and they proceed to say :—" *Judicial knowledge,* surely, *was not* required in counting the votes and in the computation of numbers. But, whether the election had been holden, and the returns made from the various precincts, in conformity to the provisions of law upon that subject—whether they came in the shape, and accompanied with the evidences of correctness and genuineness, and with that legal authentication which entitled them under the law to be received and counted, were questions of law, the decision of which involved the exercise of judgment. They were questions submitted to the judgment and decision of the Chief Justice *by the special statute which conferred on him jurisdiction of the matter of this election.*"

Now, it will readily be seen, by reference to Section 43, before recited, that the two questions which, by the law of Texas, were submitted to the judgment and decision of the Chief Justice, and upon which the above decision is predicated, are by our statute expressly withdrawn from the consideration of the Clerk of the Board of Supervisors, leaving only the simple

duty of counting votes and computing numbers, which, in the language of this decision, "surely does not require judicial knowledge" to perform. It is no excuse for him, therefore, that the Board of Canvassers, which he might have selected with a view to what afterwards took place, assumed powers not belonging to that body; nor, that he gave certificates of election according to the abstracts made under the direction of said board : and, as it is is not shown, nor indeed claimed, that he has ever made an estimate of all the returns received and opened from established precincts, nor given certificates of election to the persons who by such returns have the greatest number of votes, he, being still the Clerk of said Board of Supervisors, and still having in his possession and under his control all of such returns, may yet be required to perform his duty in the premises. The Board of Canvassers, as such, is not required to re-assemble or take any further action. The Plaintiffs ask only that the Clerk shall perform a simple ministerial duty, which it is still in his power to do, and upon the performance of which they have a clear right to insist. This duty is one devolving upon the Clerk alone, to be performed after the Board, as such, has acted, and independent of its action; and if not done immediately, as the law requires, may be required of the Clerk so long as it is in his power to do it.

Another position urged by the defence is, that, as by the Constitution the Senate is made the judge of the election and eligibility of its membsrs, no other tribunal can or ought to take jurisdiction of this case. This position, we think, is sufficiently answered by the fact that this is not a proceeding to try the right of any party to the office of Senator, but simply to determine whether the Plaintiffs are entitled at the hands of the Defendant to *certificates of election* to that office. Nor can our decision in the least affect the question of the election of either of the candidates. That question can be definitely settled by the Senate alone. The aid of this Court is sought to prevent the consequences of an usurpation of authority on the part of this Board of Canvassers, and to compel the Defendant to do his duty. All that we can do is to arm the parties entitled, with the credentials necessary to enable them properly to assert their rights before the proper tri-

O'Ferrall *v.* Colby, and Bryant *v.* Colby.

bunal. Whether they, or either of them, were legally elected is not a question here. One candidate may be entitled to a certificate of election, while his opponent may have a clear right to the office.

The evident policy of our law is, to take from the Board of Canvassers all power over returns from established precincts, and, as far as possible, deprive it of the means of doing harm. The wisdom of such a policy few will dare to question. The Justices of the Peace who were called to the assistance of the Clerk were selected by the Clerk himself; and their fitness to determine nice and difficult questions is seldom regarded in making the selection. They are chosen, rather, as witnesses of the proceedings of the Clerk—to see the manner in which he performs his duty; and applying, in substance, the language used by an eminent South-Carolina Judge, in the case of *Grier vs. Shackleford*, 3 *Brevard*, 491, while speaking of the powers of election managers in that State, (one of whom from each precinct is required to attend at the court house the day after election, and the votes being counted the managers declare the result): "It is not to be believed that the Legislature intended to hang the most important rights of the citizen on the arbitrary decision of such a tribunal. If they are to range through all the vagaries of their capricious fancies, the elective franchise will become an idle mockery. It will vary in different districts according to the views of different boards, and fluctuate in the same district, as the board is changed or the tide of popular opinion ebbs and flows. Thus, the constitution will be blown about by every blast of popular fury, and the much boasted privilege of election become the instrument of party violence and political intrigue. The law never intended any such thing. This Court is appointed by the Constitution to settle the law, that it may be uniform and certain, and its powers are commensurate with the object."

The motion for a peremptory writ of Mandamus is granted.