THE STATE OF KANSAS, *ex rel. Attorney - General,* v. W. P. TOMLINSON.

1. MEMBERS OF LEGISLATURE; *Sole Power to Judge of Election and Qualifications, Vested in Each House, Respectively.* In an action prosecuted by the state, on the relation of the attorney-general, to try the title of a defendant to his seat in the house of representatives of the legislature, and to oust him from office, where such defendant, upon the convening of the legislature, was declared and adjudged by the house to be a member and entitled to a seat in that body, and has continued to act as a member, *held,* that that this court has no jurisdiction to determine the question, as the power to judge of the elections, returns, and qualifications of its own members is vested in each house, and cannot by its own consent, nor by legislative action, be vested in any other tribunal, or officer.

2. ———— Whether or not an act passed by the votes of persons admitted as members in excess of the constitutional limit, (and not legally passed without such votes,) would, in a given case, be held constitutional and valid, can only be determined when presented in a proper action and in proper form.

*Original Proceedings in Quo Warranto.*

THE constitution, as amended in 1873, (laws of 1873, p. 249; laws of 1874, p. 217,) contains the following provision:

ART. 2, § 2: "The number of representatives and senators shall be regulated by law, but shall *never exceed one hundred and twenty-five representatives,* and forty senators. From and after the adoption of the amendment(*) the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred(†) legal votes were cast at

---

*THE words, "adoption of the amendment," are very infelicitous in a constitutional provision. As the proposed amendment was submitted at the session of 1873, and was adopted at the general election in November 1873, in place of the words named, the words, "first day of January 1874," should have been inserted; and so the house of representatives has substantially construed the amendment on several occasions.

† IN the preceding clause, "two hundred *and fifty* legal votes," are fixed as the minimum entitling a county to separate representation. And as only those counties which cast *"less* than two hundred legal votes" are to be attached to the adjacent representative district, it seems that no provision whatever is made, or authorized to be made, regarding those counties whose legal votes were 200 and upward, but *less* than 250. Again, when counties are entitled to be "attached" to an "adjacent" representative district, how is the attaching to be effected? Does it require a legislative enactment? It would seem so, but none has been yet passed.—REPORTER.

the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east."

At the session of the legislature held in 1876, an apportionment of senators and representatives was made upon the census of 1875. (Laws of 1876, pp. 7 to 16.) In this apportionment act, 38 senate districts were created, of which 36 were to choose one senator each, and two districts (Douglas county, and Leavenworth county,) two senators each, making the maximum number allowed by the constitution. The same act specifically designated and numbered 123 representative districts, which were authorized to choose one representative each. Said act contains the following provision:

"SEC. 1. The senate shall consist of forty members, and the house of representatives of one hundred and *twenty-three* members; but the number of representatives *may be increased by the organization of new counties to not more than one hundred and twenty-five.*" (Laws of 1876, p. 7.)

This act was passed and approved on the 2d of March 1876. At that time, there were several organized counties which were not included in the apportionment act. These counties, with the date of the organization of each, as proclaimed by the governor, were —

Rooks, ............................... Organized, November 26th, 1872.
Barbour, ........................: ............ Organized, April 14th, 1873.
Harper, ............................. Organized, August 20th, 1873.
Ness, ............................... Organized, October 23d, 1873.
Comanche, .......................... Organized, October 28th, 1873.
Kingman, ........................... Organized, February 27th, 1874.
Pratt, .............................. Organized, March 14th, 1874.
Edwards, ........................... Organized, August 21st, 1874.
Rush, ...........................: ...... Organized, December 5th, 1874.

The official records in the office of the secretary of state show the number of votes returned as having been cast in these counties respectively, taking the highest vote for any one office, at the general elections in the years named, to be as follows:

The State, *ex rel.*, v. Tomlinson.

| | 1873. | 1874. | 1875. | 1876. | 1877. | 1878. |
|---|---|---|---|---|---|---|
| Rooks, | 115 | 144 | 137 | 161 | 170 | 454 |
| Barbour, | 278 | 178 | 138 | 199 | 137 | 334 |
| Harper, | 276 | *none.* | *none.* | *none.* | *none.* | 365 |
| Ness, | 263 | *none.* | *none.* | *none.* | *none.* | *none.* |
| Comanche,* | 272 | *none.* | *none.* | *none.* | *none.* | *none.* |
| Kingman, | | 132 | 9 | 13 | 14 | { *Not re-* |
| Pratt, | | 82 | *none.* | *none.* | *none.* | { *turned.* |
| Edwards, | | 74 | 72 | 336 | 238 | 545 |
| Rush, | | | 48 | 143 | 284 | 736 |

At the session of 1874, representatives were admitted to seats from the counties of Rooks, Barbour, Harper, and Comanche. Ness county claimed representation, but was refused.†

At the session of 1875, a representative was admitted from Barbour. Members were returned as elected from Rooks, Kingman, Pratt, and Edwards; but the house determined that neither of these counties was entitled to representation.‡

*There was no election held on the day of the general election (November 4th 1873,) in Comanche county, but an election was held for Representative, and county officers, on the 3d of December 1873. (See House Jour. 1874, pp. 383, 384.)

†At the session of 1874, S. G. Rodgers was returned as a representative from Ness county; but the house, on the 17th of February, determined that Ness county was not entitled to representation. (House Jour. 445, 449.) See report of Committee on Elections, showing frauds in organization of said county, and in the election under which Rodgers claimed, House Journal 1874, pp. 440 to 449. See also, House Jour. 1875, pp. 103, 104, 172.

And in regard to the organization of Barbour, Comanche, and Harper counties, and their right to representation, see House Journal 1874, pp. 334, 383, 384, 417; and House Journal 1875, pp. 62 to 102, 103, 104, 172.

‡See, concerning the counties of Rooks, Kingman, Edwards, and Pratt, and their right to representation, House Journal of 1875, as follows: Resolution instructing Committee on Elections to inquire, p. 103; Report of Committee on Elections, p. 145; Resolution asking opinion of Attorney General, p. 125; Opinion of Attorney General, in response, pp. 172, 173; Majority Report of Judiciary Committee, to whom was referred the opinion of Attorney General, 267; two minority reports, pp. 268 to 270; Resolution declaring certain seats vacant, p. 275; Action of house on resolution, p. 277; Vote declaring seat of claimant from Rooks county vacant, p. 277; Vote declaring seat of claimant from Edwards county vacant, pp. 278, 279; Vote declaring seat of claimant from Ford county vacant, p. 279; Vote (by acclamation) declaring seat of claimant from Kingman vacant, p. 280. (Included in this last vote, are the counties of Harper, Ness, and Comanche; but the journal does not show that any persons were claiming seats from these counties.) As to *Edwards* county, the house, at a later day, while solemnly asserting that "no person is entitled to represent" said county in the house as a member, as solemnly "*Resolved*, That Mr. Hubbs be allowed the privileges of this house, but without the right to vote, and that he be allowed the *per diem* of a member during the session." (House Jour. 1875, p. 459.)—Reporter.

At the session of 1876, members elect appeared and claimed seats as representatives from Rooks, Barbour, and Edwards counties. A resolution was adopted, referring the question of their right to the committee on elections; (House Jour. p. 47.) Said committee reported the facts, and the questions of law were referred to the judiciary committee; (Journal, p. 75.) The judiciary committee were divided, and made three reports; (Journal, pp. 163, 164.) The house admitted the claimant from Barbour county, and refused admittance to the claimants from Rooks and Edwards; (Journal, pp. 164 to 168.)

The legislature of 1877 was chosen under the apportionment of 1876. The 123 representative districts designated in the apportionment act were all represented. And there also appeared four additional claimants to seats as members —Taylor Flick, from Edwards county; S. S. Boggs, from Rooks county; H. S. Cochran, from Barbour county; and *W. P. Tomlinson,* from Rush county.* Edwards county having cast 336 votes at the general election in 1876, Mr. Flick was admitted to his seat without question. On the 11th of January, a resolution was introduced and referred to the committee on elections, inquiring as to the right of the counties of Rooks, Barbour, and Rush to representation; (Journal, pp. 41, 96.) The committee reported in favor of the admission of the claimants from Barbour and Rooks, (Journal, pp. 154, 155,) and against the admission of the claimant (*Tomlinson*) from Rush; (Journal, p. 157.) On the 23d of January, these reports were considered. The house admitted the claimant from Barbour, (yeas 88, nays 17,) and the claimant from Rooks, yeas, 70, nays 50; and refused admission to *Tomlinson,* from Rush, yeas 37, nays 47; (House Jour. pp. 205 to 210.) On the next day, the vote relative to *Tomlinson's* right to a seat was reconsidered, and he was admitted as a member, yeas 63, nays 55; (Jour., p. 212.) On the 19th

*NONE of these counties have ever been named, or numbered, as representative districts by any statute, (nor even "numbered" as such by the house of representatives;) yet they appear in the list of districts, in the laws of 1877, p. xviii, as if duly "numbered."—REPORTER.

of January, a resolution was adopted by the house, instructing the judiciary committee "to inquire into and report the
legality of having more than 125 members" of the house,
and also asking the opinion of the attorney general. (Journal, p. 159.) No report or opinion, made or given on this
resolution, is shown in or by the journal.

On the 8th of February, the senate adopted concurrent
resolution No. 25, "providing for a joint committee to inquire into the constitutionality of the present legislature," as
follows:

"WHEREAS, It is provided by the constitution of the state of Kansas, that
the senate shall consist of not more than forty members, and the house of
representatives of not more than one hundred and twenty-five members:
therefore, be it

"*Resolved by the Senate, the House of Representatives concurring therein*, That
a joint committee of three on the part of the senate, and five on the part
of the house, be appointed to inquire whether either house has a greater
number of members than is authorized by the constitution.

"2. If said committee shall decide in their opinion that either house exceeds in number the constitutional limitation, they are hereby instructed to
prepare a case for the supreme court, and submit the same, to the end that
this question may be settled.

"3. In such case, said committee shall ask the supreme court to decide
what members are not entitled to their seats, either by exceeding the constitutional limitation, or otherwise." (Senate Journal, 1877, p. 265.)

The house concurred in the adoption of this resolution,
(House Jour., pp. 450 to 452,) and the proposed committee
was appointed; (Senate Jour., p. 326.) On the 3d of March
the committee reported their inability "to prepare a case for
the supreme court and submit the same in time to have a
decision thereon before the adjournment of the legislature"—
and concluded their report as follows:

"Your committee however, being desirous that the section of the constitution and laws enacted therewith pertaining to the number of members of
the legislature be legally passed upon, have requested the attorney general
to prepare cases and submit the same, that the question may be fully settled
by a decision from the supreme court." (Senate Jour., pp. 732, 733.)

On the 5th of March 1877, the attorney general filed in
this court a petition in *quo warranto*, wherein it is among
other matters stated and averred—

"That W. P. Tomlinson, of the county of Rush, and state
of Kansas, for the space of forty days last past, has used and
exercised unlawfully, and still does use and exercise unlaw-

fully, the office of representative for said county of Rush, in the legislature of said state, which said office, and the powers and emoluments thereto appertaining, the said W. P. Tomlinson, during all of the aforesaid time has usurped upon the government of the said state of Kansas, to the great damage and prejudice of the lawful authority thereof.

"The plaintiff further alleges, that the said W. P. Tomlinson assumes to represent the said county of Rush aforesaid as the representative of district No. 127, when in fact and in truth the said county of Rush was not and is not entitled to a representative in the legislature of said state, nor is there in law any such representative district as No. 127.

"Wherefore plaintiff prays that the said W. P. Tomlinson, defendant herein, be required to show by what authority he so exercises and performs the functions, powers and duties of the office of representative of the state of Kansas, and that upon final hearing of this action judgment of ouster may be rendered against the said defendant."

*Tomlinson* appeared and answered, alleging that Rush county was duly organized, that at the general election held in November 1876 he was duly chosen by the legal voters of said county as representative, etc., and was duly admitted to his seat as such representative by the house of representatives at the session thereof in January 1877, that he was a qualified elector of said county of Rush, and that no other person was claiming said office as representative of Rush county. To this answer the attorney general demurred. The case was heard upon these pleadings, and the facts thereby admitted.

*Willard Davis*, Attorney General, for The State:

The constitution *limits* the number of representatives to 125. The house, in plain violation of this provision, admitted defendant, after the constitutional number had already been exceeded. This action was not taken in pursuance to the second clause of the amendatory section of the constitution, for the county did not cast 250 votes, and hence the effect of this clause is not before the court for ascertainment; and if it were, it would make no difference, because the *first* clause of said section is *absolutely prohibitory*, and controls

45 — 20 KAS.

the second clause. So that if defendant had received 250 votes, still he could not have been legally admitted to a seat in view of the *absolute prohibition*, when the house already contained 125 legally-admitted members. Neither has the provision, (art. 10, § 1,) that, "in the future apportionment of the state each organized county shall have at least one representative," any bearing upon this case, for there had been no apportionment to Rush county thereunder. The only ground of defense is, that, admitting that the house violated the constitution, still, as it is made by that instrument the "judge of the elections, returns, and qualifications of its own members," its action in admitting a member is final, and beyond judicial review, not only as to the fact of the election of the member, but as to the question of the legal existence of the office. There is a broad and clearly-defined distinction between the question of the *legal existence of an office*, and that of an *election to such office*. One is a question of law — the other of fact. One is a proper subject for judicial determination — the other may properly be decided by a legislative body. The plain import of this provision is, that, assuming that under the constitution and laws a certain county or district is entitled to a representative, then the question of fact as to whether a given person has been duly elected to represent that county or district, and whether he is qualified so to do, is to be determined by the house — the courts still retaining the power of judicially determining whether the constitution and laws have *created the office* of representative for such county or district. The power of the house to "judge of the elections, returns, and qualifications of its own members," can only be exercised subject to the limit of its number of legal members fixed by the constitution, of which it is the creature. This construction has been expressly sanctioned by this court in the case of *Prouty v. Stover*, 11 Kas. 235, and should be considered at rest. We therefore maintain that, as Rush county did not cast 250 votes, as it had never had a representative apportioned to it, and as defendant was admitted to represent it

after the constitutional maximum had been exceeded, a judgment of ouster should be entered.

*J. G. Waters,* for defendant:

Under § 8 of art. 2 of the constitution, which provides that each house shall be the judge of the elections, returns, and qualifications of its own members, this court is powerless to institute any inquiry whatever as to the defendant's right to a seat in that body. I am aware this court has very broadly intimated, in the case of *Prouty v. Stover,* 11 Kas. 235, that it has the right to make inquiry into the fact whether the *district* exists or not, and if it does not, to oust him upon proper proceeding being had. I have given this case what investigation it has been at my command to make, and I find that there never has been a case instituted in the federal courts, from the foundation of the government to the present time, where the election of a member of congress was the issue. Each house has exclusively appropriated to itself that right; and no one has ever questioned the right to thus wholly and exclusively exercise this power, by a resort to the courts. By reference to the contested election cases, it will be seen that the lower house of congress has had the subject before it in almost all of its changing aspects. It has appointed committees to examine into the facts of an election; it has heard evidence; it has set aside certificates; it has inquired into the loyalty of the person, and it has determined the right of representation in the states which seceded. It has directly had before it the question of the existence of the representative district, and whether there was a vacancy to fill, and has decided these questions under the power given it by the constitution of the United States, which is similar in its terms to ours. No one has ever raised the point that its acts were not conclusive. No one of the disappointed aspirants has ever resorted to the courts to dispute its decisions.

In the case of Hugh N. Smith, who claimed to be a delegate from New Mexico, the house of the thirty-first congress decided there was then no territorial government of New

Mexico, that it was not entitled to a delegate, and thereupon refused him admittance.

In the case of A. W. Babbitt, who claimed to have been elected as delegate and representative from the "state of Deseret," the same house declared that this Utopian land had no authorized territorial organization, and he was also refused admission.

In the case of W. S. Messeroy, who claimed to have been elected delegate from New Mexico, the same house at its second session decided that he was not entitled to his seat, because the territory was not organized.

In the case of Fuller v. Kingsbury, the house of the thirty-fifth congress decided that the territory of Minnesota not included within the limits of the state on its admission in the Union, was without an organization, and not entitled to a delegate.

In the case of F. F. Lowe, who claimed to be elected as the additional and third representative from California, the house of the thirty-seventh congress held that he was not entitled to a seat, and that that state was not entitled to a third representative until two years later, when the new apportionment took effect.

In the case of Joseph Segar, who claimed to be elected an additional representative from Virginia, the house of the forty-first congress refused him a seat on the ground that there was no additional representative district in that state.

In each of these contests, the house decided for itself whether there was a representative district; and in the debates on these cases, not a single suggestion was offered calling in question the exclusive power of the house to finally adjudicate them.

In nearly all, if not all, of the states, provision is made in the fundamental law similar to ours; and in a diligent search for a precedent, I have failed to discover, in a single state, a case where the court has on any pretext whatever attempted to interfere with this constitutional prerogative of both houses of a state legislature. The doctrine intimated in the case of

*Prouty v. Stover* stands, as I think, entirely unsupported. See Cooley Const. Lim. 133.

In the case of *Kerr v. Trego*, 48 Penn. St. 292, it is declared that the legislature of a state is *supreme* and not *under law;* and is not to be made subordinate to the judgment or orders of the courts. And see *People v. Mahaney*, 13 Mich. 483. McCreary on Elections lays it down as. the law, that courts will not decide on the right of a party to hold a seat in the legislature, where by the constitution each house is made a judge of the qualifications of its own members. (Pages 274, 275.) In the case of *O'Farrell v. Colby*, 2 Minn. 180, it is further announced that the courts are powerless to act in such cases.

To permit our courts to take to themselves the power in any one case to decide who should or should not be our law-makers — with a legislature thus fashioned to suit them, our laws would soon become colored by judicial control. As the judiciary is untrammeled by any restraint in the rendition of its judgments, and in its expressions of what the law means, so must the legislature be wholly free from judicial interference. And in the case put by this court, where a legislature, to carry some partisan measure, admitted unauthorized members, the court may regret, with all good citizens, that it cannot be prevented. Yet it is no worse, nor no more to be deplored, than the arbitrary decision of a court, where, for some sinister purpose, precedent and law are violated in its determinations. They are companion pictures; neither is likely to occur. While the constitution, as I claim, has no provision to prevent these wrongs, beyond the constitution is the bar of public opinion, which, so long as people are worthy of government, will be all-powerful to speedily correct, if not prevent, such abuses of power. If this court has power to adjudicate, it has power to enforce; and if it should decide that it had jurisdiction, and rendered judgment against this defendant, what would be its action if a special session of the legislature were to be convened and the defendant again admitted? The house would, if it de-

sired, admit him, he would take his seat, vote on bills, draw his pay, and sit for his photograph, like unto the members from any other district. He could not be enjoined from participating in its deliberations, nor punished for contempt. The duty of the house in making inquiry into the qualifications of its members, (§§ 4 and 8 of article 2 of the constitution,) extends to an ascertainment whether the person asking membership resides in the county or district he wishes to represent; and this must necessarily involve the duty of the house to decide upon its existence.

The opinion of the court was delivered by

HORTON, C. J.: This is an attempt by proceedings in the nature of *quo warranto,* to try the title of defendant to his seat in the house of representatives of the legislature of Kansas. The facts, as they appear by petition and answer, are, that the defendant is a citizen of Rush county, and at the general election in 1876 was voted for and received a majority of all votes cast in that county for representative from that county; that at this election less than 250 votes were cast; that at this time, Rush county was not attached to any other county; that upon the convening of the legislature, at the session of 1877, after due consideration, the house of representatives, by a majority of the members thereof then assembled, declared and adjudged the defendant to be the "legally-elected representative from Rush county," and "entitled to a seat" as such member, since which time he has been and now is recognized as such member. (House Jour. 1877, p. 212.)

The attempt to determine the title of the defendant as a member of the legislature in this manner, must necessarily fail, for the simple reason that we cannot and ought not take jurisdiction of the case. We are powerless to enforce any judgment of ouster against a member of the legislature. While the constitution has conferred the general judicial power of the state upon the courts and certain officers specified, there are certain powers of a judicial nature which, by

the same instrument, are expressly conferred upon other bodies or officers, and among them is the power to judge of the elections, returns, and qualifications of members of the legislature.   This power is exclusively vested in each house, and cannot by its own consent, or by legislative action, be vested in any other tribunal or officer.   This power continues during the entire term of office.  Sec. 8, art. 2, State Const.; *The State v. Gilmore*, ante, p. 551.

Within certain constitutional restrictions, the executive, legislative, and judicial powers of the state, are independent and supreme; and neither has the right to enter upon the exclusive domain of the other.   We should be passing beyond the limits of our own power to judge of the election or qualifications of a member of the legislature; and as the constitution has expressly confided this power to another body, we must leave it where it has been deposited by the fundamental law.   If we are at liberty to interfere in this case, or, if with consent of the legislature we assume jurisdiction, we may review all similar decisions of that body, and in the end bring the legislative power of the state in conflict with the judiciary.   The objections to such a course are so strong and obvious, that all must acknowledge them.   We are not cited to a single case in the federal or state courts, where any member of congress, or any member of a state legislature, from the foundation of the government to the present time, has been ousted by *quo warranto*.   And the admission of this fact of itself, after the extensive investigation of this subject by the learned attorney-general, is almost conclusive that none can be found, and that the exercise of such power is not only unwarranted, but unknown.  Judge Cooley says: "These powers, it is obviously proper, should rest with the body immediately interested, as essential to enable it to enter upon and proceed with its legislative functions, without liability to interruptions or confusion."  Const. Lim. 133.

It is insisted, upon the authority of *Prouty v. Stover*, 11 Kas. 235, that this court has expressed the right to make inquiry into the fact whether the district from which a member of the legislature is admitted, exists or not, and if it does not

exist, the member may be ousted by the courts. In that case, it was only decided that where the legislature was sitting as an electoral body, in a contest concerning the validity of an election by such body, the courts were not precluded by the action of the house in admitting members from inquiring into the legality of certain representative districts, and the rights of the members admitted to seats from these districts to vote at such election. That decision is not in conflict with the view here stated, viz., that we have no jurisdiction, in a proceeding like this, to oust a person from his seat as a representative, after he has been declared and adjudged to be a member of the house by the power and tribunal having the exclusive authority to hear and determine that question. *O'Ferrall v. Colby*, 2 Minn. 180; McCrary on Elections, § 515; *Hiss v. Bartlett*, 3 Gray, 468; *People v. Mahaney*, 13 Mich. 481.

That our decision in this case may not be misunderstood, or misconstrued, we desire to say, that we do not decide that the house of representatives can consist of more than one hundred and twenty-five members, that being the maximum number allowed by the constitution; nor do we decide that the house, in the exercise of its power to judge of the election and qualification of its members, can legally admit to seats, as members, any number of persons in excess of one hundred and twenty-five; but our decision is, that, whether the house does or does not admit a greater number of persons as members than one hundred and twenty-five, this court has no jurisdiction to inquire by *quo warranto*, or otherwise, as to the right of any person to a seat as a member with a view of ousting him from his seat. Rightly or wrongly there, we are alike powerless in the premises. Whether or not an act passed by the votes of persons admitted as members in excess of the constitutional limit, (and not legally passed without such votes,) would, in a given case, be held constitutional and valid, can only be determined when presented in a proper action and in proper form.

The petition and proceedings in this action will be dismissed, at the costs of the plaintiff.

All the Justices concurring.