THE STATE OF KANSAS, *ex rel. The Attorney General*, v. JOHN FRANCIS, *as Treasurer of the State of Kansas.*

1. ENROLLED STATUTE AND JOURNALS, *As Evidence of Validity of Statute.* The enrolled statute on file in the office of the secretary of state is very strong presumptive evidence of the regularity of the passage of the statute, and of its validity; and it is conclusive evidence of such regularity and validity, unless the journals of the legislature clearly, conclusively and beyond all doubt, show that the act was not passed regularly or legally. If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid. But in this state, where each house is required by the constitution to keep and publish a journal of

its proceedings, the courts cannot wholly ignore such journals as evidence. They must be given some weight in determining the regularity and validity of the passage of statutes; and therefore, where there can be no room for doubt, from the evidence furnished by such journals, that the statute was not passed by a constitutional majority of the members of either house, then the courts may declare that the supposed statute was not legally passed, and is invalid.

2. HOUSE OF REPRESENTATIVES, *Cannot Legally Exceed 125 Members.* In 1873, ₴2, article 2, of the constitution of the state of Kansas, was amended so as to read as follows:

"SEC. 2. The number of representatives and senators shall be regulated by law, but shall never exceed one hundred and twenty-five representatives and forty senators. From and after the adoption of the amendment, the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east."

The first sentence of the foregoing section simply means that the number of representatives constituting the house of representatives, and the number of senators constituting the senate, shall be regulated by law; but the number of representatives and senators as regulated by law shall never exceed one hundred and twenty-five representatives and forty senators; and therefore under this constitutional provision, the house of representatives can never legally consist of more than one hundred and twenty-five members.

3. INVALID STATUTE; *129 Members.* In 1879, the house of representatives consisted of one hundred and twenty-nine members—just four more than are permitted by the constitution of the state—four of which members, to wit, the representatives from Rooks, Rush, Harper and Kingman counties, were not, under the constitution and laws, entitled to seats in the house of representatives as members. An act was passed that year by the legislature, but only by the assistance of the votes of these four members, and except for their votes the act would not have received a constitutional majority of the votes of the members of the house; and not counting their votes, the act did not receive a constitutional majority. *Held,* That the votes of these four members should not be counted; and therefore, *held,* that the act must be considered as not having passed the house of representatives, and as void.

*Error from Shawnee District Court.*

ACTION brought by *The State of Kansas,* on the relation of the attorney general, against *John Francis,* as treasurer of state, to restrain the defendant from paying ·a certain warrant, and

to determine the validity of chapter 20 of the Laws of 1879. The nature of the action, and the facts, appear in the opinion. Trial at the December Term, 1880, of the district court, and judgment for the defendant. *The State* brings the case here.

*W. A. Johnston,* attorney general, and *W. C. Webb,* for plaintiff in error.

*Peck, Ryan & Johnson,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: The only question involved in this case is with reference to the validity of chapter 20, of the laws of 1879, (p. 19,) passed by the legislature of the state of Kansas, on March 8, 1879, making appropriations for the state fish commissioner for the years ending June 30, 1880, and June 30, 1881; but it is claimed by counsel on both sides that involved in this main question is this further question, whether the house of representatives of the state of Kansas can ever, under any circumstances, exceed in number one hundred and twenty-five members; and this latter question, with the questions necessarily involved in it, is the only question which they desire to present to us, or to have us consider or decide.

From the admission of the state of Kansas into the union, on January 29, 1861, up to November 4, 1873, the following constitutional provisions, to wit, sections 2, 8, 10, 13, 14 and 26, of article 2, and sections 1 and 2, of article 10, were in force, as follows:

" SEC. 2. The first house of representatives under this constitution shall consist of seventy-five members, who shall be chosen for one year. The first senate shall consist of twenty-five members, who shall be chosen for two years. After the first election, the number of senators and members of the house of representatives shall be regulated by law; but shall never exceed one hundred representatives and thirty-three senators."

"SEC. 8. A majority of each house shall constitute a quorum. Each house shall establish its own rules, and shall

be judge of the elections, returns and qualifications of its own members."

"SEC. 10. Each house shall keep and publish a journal of its proceedings. The yeas and nays shall be taken and entered immediately upon the journal, upon the final passage of every bill or joint resolution. . . ."

"SEC. 13. A majority of all the members elected to each house—voting in the affirmative—shall be necessary to pass any bill or joint resolution.

"SEC. 14. Every bill and joint resolution passed by the house of representatives and senate, shall, within two days thereafter, be signed by the presiding officers, and presented to the governor; if he approve it, he shall sign it. . . ."

"SEC. 26. The legislature shall provide for taking an enumeration of the inhabitants of the state, at least once in ten years. The first enumeration shall be taken in A. D. 1865."

"SECTION 1. In the future apportionment of the state, each organized county shall have at least one representative; and each county shall be divided into as many districts as it has representatives.

"SEC. 2. It shall be the duty of the first legislature to make an apportionment, based upon the census ordered by the last legislative assembly of the territory; and a new apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the preceding year."

Soon after the state was admitted into the union, proper laws were passed for taking the census of the state, and similar laws have been in force ever since, and the legislature has made apportionments in accordance with §§ 1 and 2 of article 10 of the constitution, basing the apportionment each time upon the census of the preceding year.

On March 3, 1871, the legislature of the state of Kansas passed an act, making an apportionment for members of the legislature of the state of Kansas, § 1 of which act reads as follows:

"SECTION 1. That the senate shall consist of thirty-three members, and the house of representatives of ninety members, but the number of representatives may be increased by the organization of new counties to not more than one hundred:

*Provided,* That no county not now organized shall be entitled
to more than one representative until the next apportion-
ment." (Laws of 1871, p. 32.)

Section 3 of the above-mentioned act apportions all the
organized counties of the state into representative districts,
making ninety districts; and § 5 gives to each representative
district one representative.

On November 4, 1873, § 2 of article 2 of the constitution
was amended so as to read as follows:

"SEC. 2. The number of representatives and senators shall
be regulated by law, but shall never exceed one hundred and
twenty-five representatives and forty senators.    From and
after the adoption of the amendment, the house of repre-
sentatives shall admit one member from each county in which
at least two hundred and fifty legal votes were cast at the
next preceding general election; and each organized county
in which less than two hundred legal votes were cast at the
next preceding general election shall be attached to and con-
stitute a part of the representative district of the county
lying next adjacent to it on the east."

The other sections of the constitution above quoted still re-
main in force, as above quoted, unless they have been mod-
ified or changed by the amendment of § 2 of article 2 of the
constitution, as above quoted.

On March 2, 1876, the legislature of the state of Kansas
passed another act, making an apportionment for members of
the legislature of the state of Kansas, basing such apportion-
ment on the census of the previous year; section 1 of which
act reads as follows:

"SECTION 1. That the senate shall consist of forty mem-
bers, and the house of representatives of one hundred and
twenty-three members; but the number of representatives
may be increased by the organization of new counties to not
more than one hundred and twenty-five: *Provided,* That no
county not now organized shall be entitled to more than one
representative until the next apportionment." (Laws of 1876,
p. 7.)

By § 3 of this act, the legislature apportioned all the organ-
ized counties of the state, casting at least 250 votes at the last
preceding general election, into one hundred and twenty-three

representative districts; and by § 4 of the act, the legislature provided that each representative district should have one representative. The counties of Edwards, Barbour, Rooks, Rush, Harper and Kingman were not mentioned in this apportionment for representatives, nor were they attached to or made a part of any representative district.

At the session of the legislature in 1877, there were one hundred and twenty-seven persons admitted as members of the house of representatives, one hundred and twenty-three of which were admitted as members from the one hundred and twenty-three representative districts provided for by the apportionment of 1876, and the other four were admitted to represent the counties of Edwards, Barbour, Rooks and Rush, respectively.

At the session of the legislature in 1879, there were one hundred and twenty-nine persons admitted as members of the house of representatives, one hundred and twenty-three of which being admitted to represent the one hundred and twenty-three representative districts provided for by the apportionment of 1876, and the other six being admitted to represent the counties of Edwards, Barbour, Rooks, Rush, Harper and Kingman, respectively. All these one hundred and twenty-nine persons were admitted as members by the house of representatives, without any action of the senate, and without any further law being passed, and were admitted in the order in which we have mentioned them; and the facts were such that they were all entitled to be admitted as members, provided the house of representatives could then, under § 2 of article 2 of the constitution, and under the laws then in force, consist of one hundred and twenty-nine members.

On March 8, 1879, the legislature, as then constituted, passed the act now in controversy, making the said appropriation for the state fish commissioner; and upon the final vote taken in the house of representatives upon the passage of this act, the act received only sixty-six affirmative votes, and these sixty-six votes included the votes of the members from

Edwards, Barbour, Rooks, Rush, Harper and Kingman counties. There were twenty-seven votes cast against the act, and there were thirty-six members absent or not voting. After this act was passed, the bill was properly enrolled and signed by the officers of the respective houses, and approved and signed by the governor, and filed with the secretary of state, where it still remains and is preserved as an enrolled statute of the state of Kansas; and apparently it is as valid as any of the other enrolled statutes on file in the office of the secretary of state. .

The amount appropriated by this act was $500 for the fiscal year ending June 30, 1880, and $500 for the fiscal year ending June 30, 1881. No question was raised as to the validity of this act until December 25, 1880. The fish commissioner at various times and in various sums drew the full amount that was appropriated for the year ending June 30, 1880, and also at various times and in various sums drew the full amount that was appropriated for the year ending June 30, 1881, except the amount of $34.15. The record of this case, however, shows that this amount was $41.50.

On December 22, 1880, the auditor of state drew his warrant on the defendant as state treasurer in favor of the fish commissioner for the sum of $34.15, that sum being all that was then left not drawn of the appropriation made by the said act; and the defendant, as state treasurer, was about to pay said warrant out of the moneys in his custody belonging to the state of Kansas as a part of the general revenue fund, when this action was begun in the district court of Shawnee county, on December 25, 1880. The object of the action is to restrain the defendant, as state treasurer, from paying said warrant. The case was decided in the district court on December 31, 1880, in favor of the defendant. Afterward, and on February 3, 1881, a case for the supreme court was made, settled and signed in the district court, and on February 5, 1881, the case thus made, settled and signed, was filed in the supreme court. On June 7, 1881, the case was submitted to the supreme court for its decision, but as

the legislature had long prior to the submission of the case to the supreme court adjourned, *sine die,* and as there can be no regular session of the legislature prior to January 9, 1883, and as there can be no election for members of the legislature prior to November 7, 1882, it was not thought necessary by the supreme court to be in any great hurry in rendering the decision in this case.

The first question properly arising in this case is, whether or not the enrolled statute embodying the act in controversy is conclusive evidence of the regularity of the passage of the act, and of its validity. In many of the states of this union it is held that the enrolled statutes are conclusive evidence of the due passage and validity of the acts purporting to be embodied in them. See authorities cited in the case of the *Division of Howard County,* 15 Kas. 211; and *State v. Swift,* 10 Nev. 176, cited in the case of *Comm'rs of Leavenworth County v. Higginbotham,* 17 Kas. 78. If it should be held that the enrolled statute is conclusive evidence of the validity of the act embraced in it, that would end this case; for if the act is valid, the plaintiff certainly has no cause of action. But the defendant's counsel do not raise this question. They apparently admit that if the house of representatives cannot consist of over one hundred and twenty-five members, then the act in controversy is void, and that the plaintiff has a good cause of action. In our opinion, the enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the legislature show, clearly, conclusively and beyond all doubt that the act was not passed regularly and legally. Upon this subject, see the case of *Division of Howard County,* 15 Kas. 194; the *Comm'rs of Leavenworth County v. Higginbotham,* 17 Kas. 62. If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of

1. Enrolled statutes and journals as evidence of validity of statute.

the courts to hold that the enrolled statute is valid; but in this state, where each house is required by the constitution to keep and publish a journal of its proceedings, we cannot wholly ignore such journals as evidence. They must be given some weight in determining the regularity and validity of the passage of statutes; and therefore, where there can be no room for doubt, from the evidence furnished by such journals, that the statute was not passed by a constitutional majority of the members of either house, then the courts may declare that the supposed statute was not legally passed, and is invalid. In this case there can be no room for doubt with regard to the facts above stated. The present act was passed by the votes of persons representing the counties of Edwards, Barbour, Rooks, Rush, Harper and Kingman, along with other votes; and it was not passed by a constitutional majority unless the votes of at least three of these six persons representing said counties be counted. If these six persons had been among the first to have been admitted to seats in the legislature, and had been among the first to have been sworn in, then a difficult question might have been raised as to whether they would not be entitled to be considered as members of the legislature, whether those persons from regularly defined and numbered representative districts, who might have been sworn in among the last, and after the whole number of one hundred and twenty-five members had already been sworn in, should be considered as members of the house of representatives, or not. But as no such question has been presented by counsel, we shall not attempt to decide it.

Also, as these six persons were entitled to seats in the legislature, unless the house of representatives cannot consist of more than one hundred and twenty-five members, and as there were not one hundred and twenty-five members in the aggregate present and voting for and against the act in controversy, then were not the votes of these six persons entitled to be counted? It seems to be admitted that the votes of the representatives from Edwards and Barbour counties should be

counted; but it is claimed by the plaintiff that the votes of the representatives from Rooks, Rush, Harper and Kingman counties should not be counted; and · it seems to be admitted by counsel for defendant that if the house of representatives cannot consist of more than one hundred and twenty-five members, then that the votes of these persons from the four last-mentioned counties should not be counted, and in that case, that the act in controversy (as it was passed only by their aid) should be held to be null and void; and therefore that the plaintiff should be considered as having a good cause of action. But, without any further consideration of these preliminary and incidental questions, ·we shall pass to the main question desired to be presented by counsel, which is, whether the house of representatives, under § 2, article 2 of the constitution, as amended in 1873, can consist of more than one hundred and twenty-five members. It seems to us that said § 2 is too clear for any difference of opinion.* It says: "The number of representatives and senators shall be regulated by law; but shall never exceed one hundred and twenty-five representatives and forty senators." Filling out the latter clause of the sentence, it would read thus: "But [the number of representatives and senators, as regulated by law] shall never exceed one hundred and twenty-five representatives and forty senators." It will be seen that this "number of representatives" which "*shall* be regulated by law" and which "shall *never* exceed one hundred and twenty-five representatives," is not merely the number of any kind or class of representatives, or of any part or portion of the house of representatives. It is not merely the number of representatives from previously defined legislative districts; nor is it merely the number of representatives from subsequently organized counties; nor is it — as we have before said — the number of only some par-

2. House of representatives, not to exceed 125 members.

---

[* NOTE.—See opinion of attorney general as to the right of each organized county to have at least one representative. (House Journal of 1873, pp. 190–192.) See opinion of attorney general, (House Journal of 1875, pp. 172–3,) that the representatives from the counties of Wallace, Rooks, Edwards, Kingman, Ford, Harper, Norton, Barbour, Ness, Pawnee, Pratt and Comanche, did not then legally hold their seats as members of the house.—REPORTER.]

ticular kind or class of representatives, or of some part or portion of the house of representatives, but it is the whole number of all classes of representatives forming the entire house of representatives, without any exception or limitation. The constitution simply means that " the number of representatives [constituting the house of representatives] and the number of senators [constituting the senate] shall be regulated by law; but [the number of representatives and senators, as regulated by law] shall never exceed one hundred and twenty-five representatives and forty senators." At the time, and before the adoption of this amendment, the number of representatives constituting the house of representatives was regulated by law. At that time the maximum number of representatives was one hundred, ninety of which representatives were to be from previously defined representative districts, and ten or less of which were to be from newly organized counties, making the maximum number of representatives constituting the whole house of representatives to consist of just one hundred. At the next session of the legislature after this section was amended, the number of representatives was again regulated by law; the maximum number to constitute the whole house was to be one hundred and twenty-five, one hundred and twenty-three of which were to be from previously defined representative districts, and the other two were to be from newly organized counties. These acts of the legislature, which were passed just prior and subsequent to the adoption of the amendment of said § 2, article 2 of the constitution, would seem to indicate what the opinion of all persons was at that time respecting this subject; and we think the opinion then entertained was correct. It must also be remembered that this amendment of the constitution is the last expression of the will of the people — the supreme and original source and fountain of all civil and political power — and it must have force, even if it repeals or modifies some of the other provisions of the constitution. It cannot itself be modified by any of the other provisions of the constitution; but, if inconsistent with them, it will modify them. It is true, that we should construe

this amendment in the light of all the other provisions of the constitution, and of all the acts of the legislature having any reference thereto, and of all surrounding circumstances; but when it is ascertained what this amendment means, then it must be given full force and effect. If it differs in any respect from any of the other provisions of the constitution, they must give way, not it. If it differs in any respect from any of the provisions of the constitution relating to apportionment, or relating to any other subject, then these provisions relating to apportionment, or to such other subject, must give way, and not it. The amendment must stand, whatever else may be overturned by it. But nothing else need be overturned by it if the legislature were to act wisely and prudently. If the legislature were to fix one hundred and twenty-five, or any less number, as the maximum number of the house of representatives, and then should provide that out of this number the number of fifteen or twenty should be reserved for members from subsequently organized counties casting at least two hundred and fifty votes, then there could be no trouble, and every part and portion of the constitution and every provision of law could have full force and operation. Possibly, however, it would still be better for the legislature at the time of making the apportionment to fix the number of representatives at some definite number from fifteen to twenty less than one hundred and twenty-five, and to make this definite number correspond exactly with the number of representative districts created and defined by law; and then at each session afterward so amend the apportionment law as to increase the aggregate number of the members of the house of representatives, and so as to admit members from all new counties casting at least two hundred and fifty votes. The amendment itself does not define the mode of fixing or regulating the number of representatives and senators, and hence the legislature has a choice of modes. Indeed, the amendment is very crude in its terms, very loosely drawn and blunderingly defective. It provides that "the house of representatives shall admit one member from

each county in which at least two hundred and fifty legal votes were cast at the next preceding general election." We suppose that this was intended to apply only to new counties, though the amendment does not say so. None of the populous counties of the state are represented in the house of representatives as counties. They are each divided into districts; and only these districts are represented. But shall the counties under said amendment be also represented as counties? This amendment also provides that "each organized county in which less than two hundred legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east." But suppose that "the county lying next adjacent to it on the east" has no representative district: then what becomes of this "organized county in which less than two hundred legal votes were cast"?—and what is to be done with those other organized counties not yet mentioned which cast more than two hundred and less than two hundred and fifty legal votes? The constitution with respect to them is entirely silent. Why did not the amendment provide for these counties also?

Any construction of the first and second clauses of § 2, article 2 of the constitution, which would allow the house of representatives to consist of more than one hundred and twenty-five members, would limit the operation of such clauses, pervert their meaning, and render them, partially at least, nugatory. Any such construction of these clauses would be virtually saying that the people of Kansas, when they adopted this amendment, said at one and the same time that the number of representatives "*shall never* exceed one hundred and twenty-five," and also that the number of representatives *may* exceed one hundred and twenty-five. And further, the first clause of this section says that "the number of representatives and senators *shall be* regulated by *law*." Now, if only *a portion* of the number of representatives should be regulated by law, (that portion, for instance, coming from representative districts created at the time of making the general apportion-

ment,) or if the number should not be regulated by *law* at all, but should be regulated by the admission of members to seats in the house, *by the house of representatives alone*, then this clause of the constitution would be violated. It is the *law-making power*, and not the house of representatives alone, that must fix and regulate the number of representatives; and the law-making power must fix and regulate the number of the *entire house of representatives*, and not merely the number of those representatives who may be elected from districts defined when the general apportionment law is enacted. The house may admit its own members, but the law-making power must fix and determine the number of such members. (*Prouty v. Stover*, 11 Kas. 236.) This is made obligatory upon the law-making power by the first clause of the section, which says the number of representatives "*shall be* regulated by *law.*" This clause is affirmative and mandatory. The next clause, however, is negative and prohibitory. It says that the number "*shall never* exceed one hundred and twenty-five representatives." Now, generally, under affirmative and mandatory constitutional provisions the legislature may do more than is required; but it cannot do less, if it does its duty. Under negative and prohibitory constitutional provisions, however, the legislature may often refrain from doing things which are not prohibited; but it can never do what is prohibited. Under this negative and prohibitory clause of the section, the legislature may fix the number of representatives at less than one hundred and twenty-five, but it can never fix it at more; and there is no power in the state which can fix it at more. Therefore, whenever the house of representatives consists of more than one hundred and twenty-five members, some of such members must be there illegally. Such was the case in 1879. The house of representatives at that time consisted of one hundred and twenty-nine members. Four of these members,

3. Invalid statute; 129 members.

to wit, the four from Rooks, Rush, Harper and Kingman counties, who were not provided for by law, and who were the last members admitted to seats, were not entitled to their seats. And the act in contro-

47—26 KAS.

versy was passed only by the assistance of their votes. Except for their votes, or at least three of their votes, the act would not have received a constitutional majority of the votes of the members of the house; and not counting their votes, the act did not receive a constitutional majority. Now we do not think that their votes should be counted; and therefore we think the act in controversy must be held as not having passed the house of representatives, and as void. (*The State v. Tomlinson,* 20 Kas. 692, 704.)

The judgment of the court below will therefore be reversed, and the cause remanded for further proceedings.

. All the Justices concurring.