## STATE EX REL. BENNETT v. BARBER ET AL.

## STATE EX REL. CHAPMAN v. SAME.

MANDAMUS—ALLOWANCE OF ALTERNATIVE WRIT BY SINGLE JUS-
TICE OF SUPREME COURT—ELECTIONS—STATE BOARD OF CAN-
VASSERS—COUNTY CANVASSERS—ABSTRACT OF VOTES FOR MEM-
BERS OF LEGISLATURE—JURISDICTION OF COURT—MANDATORY
STATUTES—CERTIFICATE OF NOMINATION.

1.  The allowance of an alternative writ of mandamus is a
    method of procedure to set in motion the original juris-
    diction of the supreme court in the case of mandamus to
    state officers; and the allowance thereof in pursuance of
    statutory authority by a justice of this court in vacation or
    recess is not expressly or by fair implication inhibited by
    the constitution.

2.  It is not necessary that a petition for mandamus to the
    state board of canvassers should allege that the canvass
    was made in the presence of the Governor, the presumption
    being that the officers did their duty, and observed the re-
    quirements of the statute.  It is not necessary to allege and
    show affirmatively matters of fact which the law presumes
    from other facts which are alleged.

3.  The state board of canvassers can act only on the return
    made to it by the county clerk.

4.  The jurisdiction of the supreme court to direct the action
    of the state board of canvassers by mandamus in canvassing
    the returns of the election for members of the house of rep-
    resentatives is not affected by the constitutional and statu-
    tory provisions to the effect that each house shall judge of
    the election, returns and qualifications of its own members,
    as any decision of the court in that respect can only affect
    the board of canvassers; and the action of the board,
    whether directed by the court or not, cannot affect the au-
    thority of the house of representatives.

5.  The state board of canvassers can only determine the vote
    cast for members of the house of representatives by the re-
    turns.  It is their duty to canvass the entire vote as shown
    by the returns.  If they refuse or fail to do so mandamus
    will lie to compel them.  The discretion exercised by can-
    vassing boards is not judicial, and if they decide erroneously
    their decision may be corrected by mandamus.

6. Under the statute requiring the county clerk taking to his assistance two justices of the peace of his county (one of whom shall be of a different political party from himself if one can be found in the county) to proceed to open the election returns and make an abstract of the votes, the two justices of the peace together with the clerk constitute a county board of canvassers, and the action of the majority is the action of the board.

7. Where the return certified by the clerk to the state board contained two abstracts, one of which was the result of his determination, and the other that of the two justices who differed from him, the abstract of the justices is held to have been the official abstract and the one which should have been made by the county clerk. The state board having accepted the abstract of the county clerk its action was erroneous, and therefore said state board had not canvassed the return of the vote of the county in question.

8. In mandamus to a state canvassing board, relator claiming to be elected as member of the house of representatives, an answer being filed denying that any nomination of relator was duly or otherwise certified or filed as required by law, and alleging that the name of relator was unlawfully printed upon the official ballots, and that no votes were cast for relator except by placing a cross opposite his name where it was so printed upon the ballot, the court is obliged to consider and determine incidentally but not finally every question affecting the propriety of issuing its peremptory writ of mandamus, and the issue presented by the answer is a material one, but the ultimate right of relator to office cannot be determined as in an election contest. (Groesbeck, C. J., dissenting.)

9. Upon such statements contained in the answer, taking them as true, the relator would not be legally elected, the statute in those respects being mandatory; and the court will not arm such relator by mandamus with a certificate of election. (Groesbeck, C. J., dissenting.)

10. On demurrer to reply the latter setting out in full the certificate of the nomination of relator as filed, such certificate held to be sufficient, it being assailed for absence of statement showing when and where the nomination was made, and for what house the nomination was for, and for what county, and for insufficiency of the affidavit thereto. The

statute prescribing what the certificate should contain, and how it should be verified is not so mandatory that a mere formal defect, incapable of affecting the regular and or-derly conducting of the election or its result, should inval-idate an election. The statute in so far as it relates to the form of the certificate and the affidavit is directory only.

[Petition for mandamus filed December 9, 1892.    Peremptory
writ granted December 31, 1892.]

Original proceedings in mandamus on the relation of S. B. Bennett and Harry A. Chapman, respectively—two cases—against Amos W. Barber, Secretary of State, Charles W. Burdick, State Auditor, and Otto Gramm, State Treasurer, constituting the State board of canvassers, to require the re-spondents to canvass certain returns of the votes cast for relators for members of the house of representatives from Carbon County, at the election held on Tuesday, November 8, 1892. An alternative writ was allowed by the chief justice in vacation. The case was first heard upon a motion to quash the alternative writ on the ground that it was not allowed by the court nor by a majority of the justices, which motion was denied. Respondent then filed a motion to make the petition more definite and certain for reasons fully stated in the opinion, and at the same time a motion to strike out portions of the petition; and all that part of the motion which assailed as redundant certain allegations respecting the conduct of the election and the counting of the votes by the judges thereof, all preceding the canvass by the county board of canvassers was sustained; and that part which re-ferred to allegations concerning the canvass by such county board was overruled. To the petition and alternative writ a demurrer was then interposed the grounds of which are set out in the opinion. The demurrer was overruled. An an-swer being filed, a demurrer thereto was overruled, and a de-murrer to the reply subsequently filed was also overruled, whereupon respondents declining to further defend a per-emptory writ was granted. The several points raised upon the various motions and demurrers, as well as the facts are

fully stated in the opinions which follow. Both cases were heard together and are covered by the same opinions.

*A. C. Campbell* and *T. M. Patterson*, for relators.

*Lacey & Van Devanter* and *Charles N. Potter*, Attorney General, for respondents.

The only brief found is that of Lacey & Van Devanter of counsel for respondents on motion to quash alternative writ, in which counsel contended that the writ was void for the reason that it was not allowed by the court in term time. The constitution expressly grants to each of the justices the power to issue writs of habeas corpus, but in the cases of mandamus and quo warranto, the power is given only to the court. Const., Art. 5, Secs. 3 and 10. That difference illustrates the intention of the constitution. (In re Garvey, 7 Colo., 502; Newman v. Hammond, 46 Ind., 119; Hammock v. Loan & Trust Co., 105 U. S., 77; Blair v. Reading, 99 Ill., 600; N. W. Ins. Co. v. Wilcoxon, 64 Ga., 556; State ex rel. v. Pierce Co., 10 Neb., 476; Wallace v. Helena Elec. Ry. Co., 10 Mont., 24; State v. Clay, 3 Wyo., 393.) The granting of power to the court and the implied exclusion of such power on the part of the judges is self executing, so that the former territorial legislation respecting the allowance of writs of mandamus can have no application. Counsel also cited Ohio Const., Rev. Stat. Ohio, Vol. 1, p. 109, Sec. 18; Nebr. Const., Rev. Stat. Neb., p. 29, Sec. 29; Sutherland Stat. Construction, Sec. 397; 44 Mo., 211.

---

### ON MOTION TO QUASH THE ALTERNATIVE WRITS OF MANDAMUS.

Groesbeck, Chief Justice.

The alternative writs of mandamus in the above entitled causes presenting substantially the same array of facts, were allowed by the chief justice of this court during the recess and vacation of the court, and were each made returnable by him to the court at the first day of its ensuing adjourned term.

On that day, a motion to quash the alternative writ was inter-posed in each case on the ground that a justice of this court has no power to allow and direct to be issued such writ. These motions, by agreement, were argued and disposed of together.

The power to allow the writ by a justice of this court is not expressed in the constitution of this State. The provisions of that instrument conferring the jurisdiction upon the supreme court is "original jurisdiction in quo warranto and mandamus as to all State officers, and in habeas corpus." Each of the judges of said court has power under the same section of the constitution to issue writs of habeas corpus to any part of the State upon petition by or on behalf of a person held in actual custody, and may make the writ returnable before himself or before the supreme court, or before any district court of the State or any judge thereof. Con. Wyo., Art. V, Sec. 3. The power and authority to issue the alternative writ of mandamus by a member of this court is wholly dependent upon the following provision of the Revised Statutes of this State, and by implication in the constitution: "When the right to require the performance of the act is clear, and it is apparent that no valid excuse can be given for not performing it, a court may, in the first instance, allow a peremptory mandamus; and in all other cases an alternative writ must first be issued on the allowance of the court, or a judge thereof." Rev. Stat. Wyo., Sec. 3077. The sections of the Code of Civil Procedure relating to mandamus were enacted prior to the admission of the State into the Union and before the constitution took effect thereby, under the powers bestowed upon the supreme and district courts by congressional and legislative enactment. All laws in force in the territory of Wyoming at the time of the taking effect of the constitution of the State, not repugnant to the same, remain in force until they expire by their own limitation, or be altered or repealed by the legislature. Sec. 3 of Art. XXI, Con. (Schedule). The Revised Statutes of the Territory and the session laws following the revision, in so far as they do not conflict with, or are repugnant to the provisions of the con-

stitution of the State, were, by express legislative enactment, declared to be in full force and effect, and were made the laws of the State, except so far as they may have been or may be repealed, or amended and re-enacted. Chap. 35, Sess. Laws 1890-1. It is urged that the provisions of the Code, Sec. 3077, Rev. Stat., supra, are repugnant to the provisions of the constitution, as original jurisdiction bestowed upon the supreme court in cases of mandamus as to State officers, prohibits any of the justices or judges thereof from exercising any such power, even to the issuance of the initial writ. It is also contended that, inasmuch as district courts and "their judges" shall have power to issue writs of mandamus (Art. V, Sec. 10, of the Constitution) and the grant of judicial power to judges of the supreme court severally is only as to the issuance of writs of habeas corpus, that such judges have no other judicial power except as members of the court, in banc. But any powers conferred upon a single judge of the court, in aid of its original jurisdiction by statute, not with a design to strip the court of its original jurisdiction or to vest its powers in a single judge, does not seem to be hostile to the constitution. The office of the alternative writ of mandamus is merely to apprise the party to whom it runs of the command or order to be obeyed, in case he or it chooses to comply with it, and to notify him that he must allege or show cause if he disobeys it. It is in the position of a declaration at common law. This court cannot be perpetually in session, and to adopt a strict construction of our constitution in this respect would deprive the court of its original jurisdiction, in a measure, and prevent the enforcement of the remedy secured by the writ in the vacation or recess of the court. At such times, under such an interpretation of the constitution, the jurisdiction of this court could not be invoked, unless there is some method prescribed to secure a footing in this tribunal so that it may exercise its original jurisdiction in mandamus as to State officers. The people of a State, in framing their constitution committed to the legislature the whole lawmaking power of the State, which they did not expressly or impliedly withhold. Plenary power in the legislature is the rule, for

all purposes of civil government, and a prohibition to exercise a particular power is an exception. It has never been questioned that American legislatures have the same unlimited power in regard to legislation which resides in the British parliament, except when they are restrained by written constitutions. Cooley on Const. Lim., pp. 88 and 89, and cases there cited. The power may not be expressly inhibited, but may be implied from the frame of government, the grant of legislative authority, the organization of the judicial power, the creation · of courts of justice, which create implied limitations upon the law-making power as sweeping as though a negative were expressed in each instance; but independently of these restraints, expressed or implied, every subject within the scope of civil government is liable to be dealt with by the legislature. Id. The statute prescribes a method of procedure by which mandamus proceedings may be directly brought into this court, and this aids and does not destroy its original jurisdiction, although this proceeding in its inception may be set in motion by a single judge as well as the court itself. Such justice or judge can not determine any matter belonging to the court, except in cases of habeas corpus, and the legislature can confer no power upon a member of the court that would erect a new tribunal unknown to the constitution and antagonistic to it, or that would place him in such a position that would in effect usurp the constitutional functions, powers or duties of the court of which he is a member. The statute does not attempt to confer such powers or duties, as he is required or permitted to issue the alternative writ only; it goes no farther and does not confer the additional power of hearing and determining the cause or proceeding or of issuing the final and peremptory writ.

We have examined with much care the case of In re Garvey, 7 Colo., 502, 4 Pacific, 758, where it was held that under the power conferred by the constitution of that State upon its supreme court "to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction and other original and remedial writs, with authority to hear and determine the same," this clause by clear implication forbade the exercise

of such authority by the justices of such court out of term. Our constitution differs somewhat from the Colorado constitution in this respect, as the jurisdiction conferred by the former is "original jurisdiction in quo warranto and mandamus as to all State officers," but the principle involved is much the same. The statute in Colorado conferred this authority to issue writs of habeas corpus upon the several judges of the supreme court, and it was held repugnant to the constitution "chiefly because the enumeration by the constitution of certain powers to be exercised by the court, and other language contained in that instrument, by clear implication forbids the exercise of such authority by the justices out of term." The case of Ex parte Bollman (4 Cranch, 75) is referred to in the opinion and it is therein stated that in the case cited, "under a statute giving the right to justices of the Supreme Court of the United States to issue the writ, but not to the court, it was held (Johnson, J., dissenting) that the court might do so if in the exercise of its appellate powers; but that the converse of this proposition would legally follow is far from conclusive." This reference is most unfortunate, as an examination of the opinion of the majority of the court by Mr. Chief Justice Marshall will show. In the course of the opinion in that case it was held that the court might issue such a writ in the exercise of its appellate and revisory jurisdiction under the Judiciary Act of 1789, which also conferred the power to grant writs of habeas corpus on "either of the justices of the supreme court, as well as judges of the district courts." That this grant to the justices of the supreme court was a grant of power that was constitutional was not doubted. It is said therein: "It has been argued that congress could never intend to give a power of this kind to one of the judges of this court, which is refused to all of them when assembled. There is much force in this argument," etc. Again: "Whatever motives might induce the legislature to withhold from the supreme court the power to award the great writ of habeas corpus, there could be none which would induce them to withhold it from every court of the United States; and as it is granted to all in the same sentence and by the same words,

the sound construction would seem to be, that the first sentence vests this power in all the courts of the United States; but as those courts are not always in session, the second sentence vests it in every justice and judge of the United States." Johnson, J., says in his dissenting opinion: "Let it be remembered that I am not disputing the power of individual judges who compose this court to issue the writ of habeas corpus." But the Supreme Court of the United States held that the statute did give the right to the court as well as to the justices thereof to issue the writ, exactly contrary to the statement made in In re Garvey. The federal Supreme Court has always held that it could review the proceedings of an inferior court in the exercise of its appellate and revisory jurisdiction by habeas corpus to inquire into the jurisdiction of an inferior tribunal and the legality of the sentence or judgment. It is not necessary to cite any of these cases as their name is legion and the practice of the court is well known from a multitude of cases. The decision of the Colorado case on the point in question concludes as follows: "And considering the language of our own constitution touching the question, and also the nature, objects and prime functions of our supreme court, we conclude that the justices thereof, acting singly or out of term, are without constitutional authority to issue certain writs enumerated in the constitutional provision referred to, or to hear or determine matters arising thereon." The power conferred by the Colorado constitution, as it then read, upon the supreme court of that State, was to issue writs of habeas corpus, etc., with authority to hear and determine the same. Undoubtedly under this grant of jurisdiction, a single justice of that court could not "hear and determine" a writ of habeas corpus, but it is not clear that he could not issue the writ and make it returnable before the court. It was held in Ex parte Clarke, 100 U. S., 402, that the Supreme Court of the United States could proceed upon a writ of habeas corpus which was originally presented to a justice of that court, and was postponed and referred by him to the court for its determination, on the ground that such action of a single justice of the court was essential to the juris-

diction of the court, and that case was distinguished from Kaine's case, 14 Howard, 103, where the court would not act on a writ issued by Mr. Justice Nelson, as the writ had been issued by him by virtue of his original jurisdiction, although the court was of the opinion that it could issue a new writ in virtue of its own appellate jurisdiction and would do so if the case required it. If a justice of the Supreme Court of the United States could issue a writ making it returnable to his court, in aid of its appellate or revisory jurisdiction, and as essential to that jurisdiction, it seems that a justice of this court could issue a writ in like manner returnable to the court of which he is a member, as essential to its original jurisdiction. The constitution of Missouri, Art. VI, Sec. 3, provides that: "The supreme court shall have a general superintending control over all inferior courts. It shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari and other original remedial writs, and to hear and determine the same." This section was passed upon by the supreme court of that State, in the following language: "The alternative writ of mandamus was issued by a member of this court in vacation, returnable to this term. A motion based on that ground has been filed to quash the writ. The statute authorizes a judge of this court to issue such a writ in vacation. Rev. Stat., Sec. 3254. This statutory provision does not impinge upon Section 3 of Article 6, of our State constitution. If, however, such a writ should be issued in the manner as aforesaid, and the judges of this court should determine that it had been improvidently issued, this might result in the writ being quashed; but this result would not follow merely because the writ was issued in vacation. The motion to quash, in this instance, is, therefore, denied." State ex rel. Sharp v. Weeks, 93 Missouri, 501, 6 S. W., 266; see State ex rel. Macklin v. Rombaur, 104 Mo., 619.

In the Missouri constitution the power to issue the writ of mandamus is lodged in the supreme court, yet a statute providing that a member of the court could issue the alternative writ was held not to violate that provision. The same ruling would apply as to the power to issue the writ of habeas corpus

5

by a single member of the court returnable before the full bench.    We think that the Missouri case is much stronger and more directly in point than the Colorado case.

Under our statute, a single justice of this court, as well as the court itself, may hear an application for a writ of error in a criminal cause and allow the same, and he may order a suspension of the execution of a sentence of the court appealed from, even in a capital case, until the writ of error is heard and determined by the supreme court.    Section 3354-6, Rev. Stat. Wyo.    It certainly will not be contended that these statutory provisions, so essential to the right of the accused, in bestowing this necessary power upon a judge of this court, are repugnant to the constitution of this State, because that instrument confers upon the supreme court appellate jurisdiction in both civil and criminal causes and a general superintending control over all inferior courts, under such rules and regulations as may be prescribed by law, and does not in express terms give any judge of that court any judicial power except to issue writs of habeas corpus returnable before himself or his court or any district court or judge thereof.    It seems that such powers bestowed upon a single judge of the court of last resort by statute is essential to the preservation of and incident to its appellate jurisdiction.    So in the case of the statute providing that the alternative writ of mandamus may be allowed by a single judge of the court, as a means of procedure, in vacation or recess of the court to bring the case before the court; it does not destroy or impair the original jurisdiction of the supreme court in such cases, but invokes it in the only manner it can be invoked when the court is not in session.    It is true that the writer of this opinion has heretofore entertained a different view from that expressed herein, and refused in one instance to allow the alternative writ, stating as one ground of refusal that such a writ could not be issued in vacation; but the writ was refused on another ground, which was conclusive, and that was that the writ prayed for would run to one not a State officer.    To sustain such a position as to right to allow the writ in vacation where this court has original jurisdiction, taken as it was on an

application made by mail to the clerk, and not personally to any member of this court, and without the benefit of the assistance of counsel in the case or time for a full examination of the authorities, would have but the merit of consistency.

On the ground that the allowance of the alternative writ is merely a method of procedure to set in motion the original jurisdiction of this court in mandamus to State officers, and is not expressly or by fair implication inhibited by the constitution, we hold that such a writ may be allowed by a justice of this court in vacation or in the recess of the court. The only express inhibition upon the legislature as to the imposition of judicial duties upon this court or any member thereof is found in Section 16 of Article 5, of the State constitution. It is as follows: "No duties shall be imposed by law upon the supreme court or any of the judges thereof, except such as are judicial," etc.

This might necessarily imply that some judicial duties might be imposed by statute upon the judges of this court, as well as upon the court itself. Certainly this could be done where such duties would not exclude, interfere with, or absorb any of the functions of the court. The issuance of the alternative writ of mandamus is not such a case.

The motions to quash are overruled.

CONAWAY and MERRELL, JJ., concur.

---

ON MOTION TO STRIKE OUT CERTAIN ALLEGATIONS IN THE PETITIONS AND TO MAKE THE PETITIONS MORE DEFINITE AND CERTAIN.

CONAWAY, JUSTICE.

A motion was interposed by defendants to strike out certain portions of the petition in each of these causes. These are allegations of fact as to the vote and return of the vote at Hanna Polling Precinct and the action of the State board of canvassers thereon. The State board of canvassers can act only on the return made to it by the county clerk. The inquiry in this court is directed to two leading points:

1.   Has this court jurisdiction to control the action of the State board of canvassers, and correct it if erroneous?

2.   Was the action of the State board erroneous upon the return as presented?

We have endeavored to purge the record of matter not pertinent to either of these inquiries.   The propriety of doing so is quite apparent.   If such matter were allowed to remain in the petition and were denied by the defendants, it would devolve upon both parties, as a matter of ordinary care and precaution, at least, if not as a matter of necessity, to prepare for trial upon these irrelevant issues.   And a demurrer would involve the admission of the truth of irrelevant matters of fact, of the effect of which there might well be doubt.   Neither court nor counsel should be employed in the consideration of such matters.   Another motion has been presented to require relators to make their petitions more definite and certain. The law requires the canvass by the State canvassing board to be made in the presence of the governor.   The ground of the motion is that the petition should show this fact.   We think this is not necessary.   The presumption is that these officers of the law did their duty and observed the requirements of the statute in their official action.   It is not necessary to allege and show affirmatively matters of fact which the law presumes from other facts, which are alleged.   Sections 2477 and 3083, Rev. Stat. Wyo. (Code of Civil Procedure).

The motion to strike out is sustained as to paragraphs 1, 2 and 5, as indicated by counsel, and overruled as to paragraphs marked 3 and 4.   The motion to make the petition more definite and certain is overruled in each case.

GROESBECK, C. J., and MERRELL, J., concur.

---

### ON DEMURRER TO PETITIONS AND ALTERNATIVE WRITS OF MANDAMUS.

CONAWAY, JUSTICE.

The petitions for mandamus in these cases set forth in extenso, with various matters of inducement and explanation,

an instrument of writing over the certificate of the county clerk of Carbon County, entitled: "Abstract of votes cast for members of the State legislature at a general election held in the County of Carbon, in the State of Wyoming, on Tuesday, the eighth day of November, A. D. 1892." The portions of this instrument necessary to an understanding of the demurrers are as follows: "Be it remembered, that on the 23d day of November, A. D. 1892, being the fifteenth day after the close of said election, B. S. Ross, county clerk of said county, taking to his assistance Charles P. Hill and William E. Tilton, two justices of the peace of said county (the said Charles P. Hill being of a different political party from the said B. S. Ross) did proceed to open the returns of said election, and to make abstracts of the votes cast at said election as shown by said returns, and, continuing the same from time to time until the 29th day of November, A. D. 1892, did complete the same, and did make the following abstract of votes cast for members of the State legislature, to wit:" "* * * S. B. Bennett received eight hundred and thirty votes for the office of member of the house of representatives from the County of Carbon, to wit: the territory embraced in the counties of Carbon and Natrona, State of Wyoming. * * * Harry A. Chapman received eight hundred and twenty-two votes for the office of member of the house of representatives from the County of Carbon, to wit: the territory embraced within the counties of Carbon and Natrona, State of Wyoming." * * * "And be it also remembered, that the said justices of the peace, differing from the said county clerk, did, over the objection and against the protest of the said county clerk, count what the said justices of the peace held to be the returns from election district Number Six, Hanna Polling Precinct Number One, in said county, which were held by said county clerk to be no returns, and unauthenticated, and as wholly failing to show that they were the returns of any election held in any precinct in said county; and the said two justices of the peace, over the objection and against the protest of the said county clerk, as aforesaid, did make the following abstract of votes cast for members of the State legislature,

to wit: * * * S. B. Bennett received nine hundred and seventy-one votes for the office of member of the house of representatives from the County of Carbon, to wit: the territory embraced within the counties of Carbon and Natrona, State of Wyoming. Harry A. Chapman received nine hundred and sixty votes for the office of member of the house of representatives from the County of Carbon, to wit: the territory embraced within the counties of Carbon and Natrona, State of Wyoming." * * *

These two abstracts of votes appear in a single paper over the official certificate of the county clerk. Defendants, constituting the State canvassing board, counted the abstract made by the county clerk as the official return of the vote of Carbon County. Such count results in the defeat of relators. Relators claim that the abstract made by the two justices of the peace is the actual legal official return of the vote of Carbon County. If counted as such it results in their election. They ask the writ of mandamus of this court compelling the State board of canvassers to so count this abstract.

Defendants demur in each case on the following grounds:

1. The said petition and the said alternative writ do not set forth any circumstances which render it necessary or proper that a writ of mandamus should issue originally from this court.

2. It appears upon the face of the said petition and the said alternative writ, that this court has no jurisdiction of the subject of this action.

3. Neither the said petition nor the said alternative writ states facts sufficient to constitute a cause of action.

4. Neither the said petition nor the said alternative writ state facts sufficient to entitle the plaintiff to the relief prayed for, or to any relief.

The first objection is merely formal, and is waived as tending to delay in presenting an amended petition, all parties desiring an early decision. The second objection, which is to the jurisdiction, is founded upon constitutional and statutory provisions to the effect that each house shall judge of the elections, returns and qualifications of its own members. It is

urged that this action is, in effect, to determine the election of members of the house of representatives, and so interferes with the constitutional prerogative of the said house to judge of the election of its members.

If the effect of the decision of this cause could be as extensive in its scope as have been some of the discussions of counsel this objection might be valid. In connection with vigorous strictures upon political methods, the courts have been mentioned as the last bulwark of the rights of the people. This is a high compliment to the courts, and one which they should endeavor to deserve. But in cases like the present, it is hardly appropriate. In such cases, the courts are not the last or the principal bulwark of the rights of the people in choosing their representatives. The final and plenary jurisdiction, upon which the people must rely in the last resort in such cases is that of the house of representatives itself. And courts will not entertain the idea that other tribunals, in which the constitution and the laws have vested some small portion of judicial power, will not exercise such power with as much wisdom and justice as could the courts.

But the decision of this cause can affect only the action of the State board of canvassers. The action of the State board of canvassers, whether directed by the court or not, cannot affect the authority of the house of representatives. The second ground of demurrer is not well taken.

The third and fourth grounds of demurrer are similar in their nature and may be considered together. These grounds of demurrer are that the facts stated are not sufficient to constitute a cause of action, or to entitle relators to the relief prayed for, or any relief.

The constitution of the State of Wyoming confers upon the supreme court of the State original jurisdiction in mandamus as to all State officers. The statute defining and regulating the procedure in mandamus defines mandamus as "a writ issued in the name of the territory to an inferior tribunal, a corporation, board or person commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station." Rev. Stat., Sec. 3073. This

statute, enacted for the territory, is continued in force in the State, it not being repugnant to any provision of the constitution. The law specially enjoins it upon the defendants, as a duty resulting from their office, within thirty days after the election and sooner if all the returns be received, to proceed in the presence of the governor to canvass the vote for all members of the council and house of representatives. Session Laws 1890, p. 78, Sec. 141. Their only means of determining what is the vote for members of the house of representatives are the returns. It is clearly their duty to canvass the entire vote as shown by these returns. If they refuse or fail to do this, it is not questioned that mandamus will lie to compel them. The contention of defendants is that they have canvassed the entire vote of Carbon County, as shown by the official return. The difficulty in the case arises from the fact that the document sent up by the county clerk contains copies of two abstracts showing different results. One was made by himself without the concurrence of either of the two justices of the peace whom he had called to his assistance. The other was made by the two justices over his objection and against his protest. His official certificate is "that the foregoing is a full, true and correct copy of the abstract of the returns of all votes cast in said county for members of the State legislature." It does not specify which is the full, true and correct copy of the returns of all votes cast in said county for members of the State legislature. It was evidently intended to put the State canvassing board in possession of the facts of the Carbon County canvass leaving it for that board to determine which canvass and which abstract was official and legal. It in effect does this. The State board was under the necessity of deciding this question. It did decide it, and it is claimed that such decision was the exercise of a discretion which cannot be controlled by mandamus. Our statute provides that this writ cannot control judicial discretion. It would seem that the discretion exercised by canvassing boards in determining questions of this nature is not a judicial discretion, and that if they decide erroneously, their decision may be corrected by mandamus. State ex rel. Barbin v. Secretary

of State, 32 La. Ann. Rep., p. 579; People ex rel. Fuller et al. v. Hilliard et al., 29 Ill., 413; Simon v. Darham, 10 Ore., 52; State ex rel. Metcalf v. Garesche et al., 65 Mo., 480; O'Ferrall v. Colby, 2 Minn., 180; Brown v. O'Bryan, 2 Carter (Ind.), 423; State v. Board of Canvassers, 36 Wis., 498; Luce v. Mayhew, 13 Gray, 83; State v. County Judge, 7 Iowa, 201; Ingerson v. Berry, 14 Ohio St., 324; Coll v. City Board (Mich.), 47 N. W., 227; State v. County Judge, 7 Iowa, 186; State v. Bailey, 7 Iowa, 390; Ellis v. County Commissioners, 2 Gray, 370; State v. Dinsmore, 5 Neb., 145; State v. Wilson, 24 Neb., 139; Morgan v. Board, 24 Kan., 71; In re Strong, 20 Pick, 484; Clark v. Board, 126 Mass., 282; Johnson v. State (Ind.), 27 N. E., 422; Kisler v. Cameron, 39 Ind., 488; ·Moore v. Kessler, 59 Ind., 152; State v. Gibbs, 13 Florida, 55; People v. Schiellen, 95 N. Y., 124; State v. Peacock, 15 Neb., 442; People v. Nordheim, 99 Ill., 563; Hagerty v. Arnold, 13 Kan., 367; Brower v. O'Brien, 2 Ind., 423. The case of Arberry v. Beaver, 6 Texas, 457, is cited to the contrary. In that case special powers were conferred by statute upon the canvasser different from the powers of ordinary canvassing officers or boards. We now come to the principal question in the case: Did the defendants err in accepting and canvassing the copy of the abstract made by the county clerk of Carbon County as the return of the vote of that county, and in rejecting the copy of the abstract made by the two justices of the peace whom he had called to his assistance? This, under our statutes, is a question of no little difficulty. Unaided by respectable authorities, we would approach a decision with hesitation and diffidence. In the result which we have reached we are aided and guided by concurrent authorities of great weight and of the highest respectability. The law under which the two conflicting abstracts in question were made provides that on the fifteenth day after the close of any county or general election, or sooner if all the returns be received, the clerk of the county, taking to his assistance two justices of the peace of his county (one of whom shall be of a different political party from himself, if one can be found in

his county) shall proceed to open said returns and make abstracts of the votes.   Session Laws of 1890, p. 177, Sec. 137.

What is the nature of the assistance to be rendered by these justices of the peace?   Is it merely by their presence to enable the clerk to open the returns and make abstracts of the votes as sole canvasser, or do they, with the clerk, constitute a board of canvassers which can act by a majority of its members?   The following section, 138, provides that "in canvassing the returns the vote of every precinct returned within fifteen days after the election to the county clerk shall be counted and the canvassers shall not throw out the vote of any precinct so returned."   Who are the canvassers, who, but for this provision, might throw out a precinct?   The next section, 139, provides that the county clerk immediately after making out abstracts of the votes given in his county shall make a copy of such abstract and transmit the same by mail or by some proper person to the office of the secretary of the territory.   A copy of what abstract should he so transmit, an abstract made by himself and by his own sole authority, or one made by authority of a board of canvassers consisting of himself and the two justices of the peace called to his assistance? It is primarily necessary to determine the character in which the two justices of the peace appear; whether as canvassers or members of a canvassing board, or merely as attendants upon the county clerk acting as sole canvasser.   The cases of O'Ferrall v. Colby and Bryant v. Colby, 2 Minn., 180, were decided under a statute requiring the clerk of the board of supervisors, taking to his assistance two justices of the peace of the county, to proceed to open the returns and make abstracts of the votes.   It appeared from the pleadings that in the canvass so made the return of the vote of one precinct was rejected resulting in the defeat of the plaintiffs, whereas, had it been counted, they would have been elected.   On this showing the court required the clerk, by its peremptory writ of mandamus, to issue to the plaintiffs certificates of election as state senators.   The court remarks in its opinion that the "justices of the peace who were called to the assistance of the clerk were selected by the clerk himself; and their fitness

to determine nice and difficult questions of law is seldom regarded in making the selection. They are chosen, rather, as witnesses of the proceedings of the clerk to see the manner in which he performs his duty," etc. In another portion of the opinion, speaking of the clerk, the court says: "It is no excuse for him, therefore, that the board of canvassers, which he might have selected with a view to what afterwards took place, assumed powers not belonging to that body; nor that he gave certificates of election according to abstracts made under the direction of that board." The case of Smith v. Lawrence, 2 S. D., 185, was decided under statutory provisions which, so far as material to the present inquiry, were as follows:

"On or before the tenth day after the close of any election, or as soon thereafter as all the returns are received, the county clerk or auditor shall take to his assistance a majority of the county commissioners of the county, or the county treasurer, judge of the county court and one county commissioner, none of which persons so called shall be candidates for office, unless there is not sufficient of said officers who are not such candidates, and shall proceed to open the returns from the various precincts in said county, and make abstracts of the votes in the following manner." Another section provides that "if the county auditor or county clerk, as the case may be, is a candidate for office, he shall take no part in the canvass, but shall act as clerk for the said board of canvassers for the county," etc. This would seem to be a legislative construction of the section first quoted to the effect that the clerk or auditor together with the other State officers taken to his assistance constituted a board of canvassers, and this seems to be the view upon which the court acted. The case of the People ex rel. Fuller v. Hilliard et al., 29 Ill., 413, was decided under a statute providing that on the seventh day after the election, or sooner if all the returns be received, the clerk of the county court, taking to his assistance two justices of the peace of his county, shall proceed to open said returns and make abstracts of the votes in the following manner," etc. The clerks and justices are considered by the court as can-

vassing officers, and are mentioned as "the board." In commenting upon the matter, the court says: "These officers are clothed with no discretionary power. They are to open 'the said returns,' and make abstracts of the votes as they appear in said returns, and the clerk is to deliver a certificate of election to each of the persons, having the highest number of votes, as manifested by 'the said returns.' They are not allowed to reject any returns, or to decide upon their validity, if on the face, they are made in compliance with the law, and in the form prescribed by the statute."

In the case of Dalton, Clerk, v. The State ex rel. Richardson, 43 Ohio State, 652, under statutes similar to ours, the court treats the clerk and the two justices of the peace called by him to his assistance, as canvassers, and mentions them as "the board."

In Bowen v. Hixon, 45 Missouri, 340, which was decided under a statute requiring the clerk to take to his assistance two justices of the peace of his county, or two justices of the county court, and examine and cast up the votes of each candidate, the court says, it is simply a plain ministerial duty of the clerk aided by the two magistrates requiring sufficient knowledge of arithmetic and moral honesty to count correctly, and clerical ability to make the certificate, and the three officers are called "the board." The decision is that, having completed their duty, they could not legally reconvene of their own motion, and make another canvass and declare a different result.

The case of The State v. Hill, 10 Neb., 58, was decided under a statute requiring the county clerk, together with two disinterested electors of the county, to be chosen by himself, to open the returns and make complete abstracts of the votes cast for each several office at said election. The court says it seems quite clear that it is the duty of the clerk and his two assistants, who are usually—though not very accurately—called the board of canvassers, to tabulate the votes contained in each one of the returns, or in other words, the returns received from each of the precincts, and in ascertaining the result, to add up the votes given for each candidate respectively, as returned from each precinct, from which a re-

turn of votes has in fact been received. The three officers are treated as canvassers, though it is said they are not very accurately called a board of canvassers. This case is also a crushing if not conclusive authority against the contention of defendants that the duties of canvassers are judicial or quasi judicial and not to be controlled by mandamus. The court continues: "And, when we come to look into the authorities and examine the adjudicated cases, we find that the courts, with almost entire unanimity, agree in defining the duties of canvassers under similar statutes as ministerial, consisting in tabulating and adding up the votes and declaring the result, and in denying to the said board any judicial or discretionary power, or any right to throw out votes which have been in fact returned for any cause whatever." After mentioning two Nebraska cases supporting the same doctrine, the court proceeds: "Judge McCrary, in his valuable work on the law of elections has collated the cases, showing that the courts of last resort of fifteen of the States of the Union substantially unite in denying to boards of canvassers any discretionary or judicial power."

In the case of Magee v. Supervisors of Calaveras County, 10 California, 376, the court refused a writ of mandamus to compel defendants, canvassers of the county, to issue a certificate of election to plaintiff, the canvassers having declared the result of the election adversely to him. The court says: "By law it is the duty of the supervisors to canvass the returns of the vote of that county, and to ascertain and declare for whom the greater number of legal votes are cast. If they neglect this duty, the court will award a mandamus to compel them to act, but cannot control their action." If by the law of California the supervisors as canvassers were invested with authority to determine the legality of the votes cast and count only legal votes, this decision is clearly correct. Such seems not to be the law of most of the States or of Wyoming. It would seem that under statutes like ours, the courts are substantially unanimous in considering the county clerk and the officers whom he calls to his assistance as all acting officially as canvassers in opening the returns and making abstracts of the

votes of their county.  Most of the cases term them a board
of canvassers.  The Nebraska case, State v. Hill, supra, says
they are not very accurately so called, but it is not apparent
wherein the inaccuracy consists.  There can hardly be a dif-
ference of opinion that the weight of authority coincides with
the reason and policy of the law.  The rights of the people in
choosing their officers are certainly safer in the hands of a
canvassing board of three persons, of different political parties
when practicable, than in the hands of one man.  It is easy to
see how absolute authority in the important and delicate duty
of canvassing the vote of the counties respectively, vested
in a single officer in each county, will result in conflicting
views of law and duty, and diverse practices in different coun-
ties.  In one county the votes of precincts would be refused
on one ground, in another county on a different ground, as
affecting their authenticity.  This evil will evidently be coun-
teracted to a considerable extent by a board of canvassers or-
ganized as indicated.  It results from these views that the
two justices of the peace whom the county clerk of Carbon
County took to his assistance in canvassing the vote of Carbon
County, together with himself constituted a board of canvas-
sers for the county; that the action of a majority of them was
the action of the board; that the abstract made by the justices
of the peace was the official abstract of the votes of the pre-
cincts of the county, and the one that should have been made
by the county clerk.  That he did not do this must not be al-
lowed to defeat the operation of the law or the rights of the
parties or the people.

The county clerk has acted with perfect fairness from his
view of the law.  He has placed the State canvassing board,
and through it, this court, in possession of the exact facts as
to the action of himself and his associate canvassers in making
the canvass of the Carbon County vote.  We must consider
the copy of the abstract made by the two justices of the
peace as the one authorized by the action of the majority of
the board and as the legal and official return to the State
board of canvassers of the vote of Carbon County.

It results that the State board has not canvassed the return

of the vote of that county, but another apparent and unauthorized return. Their duty to canvass the true return is ministerial, and may be controlled by mandamus.

The demurrer is overruled.

Groesbeck, C. J., and Merrell, J., concur.

---

### ON DEMURRER TO ANSWER.

Conaway, Justice.

As this is a case of public interest, in order to avoid any possible misunderstanding as to what really has been decided or what is now to be decided in the case, we will state that it is not an election contest.

The ultimate right of relators or either of them to any office can not be determined in this action. The question of fraud or illegality in the voting of any precinct can not be considered in this action.

Such questions could not lawfully be considered by the county canvassing board of Carbon County, or by the defendants, the State canvassing board, and can not be considered by this court in this action. What has been decided in overruling the demurrer to the petition is that the county canvassing board of Carbon County, having found by a majority of its members, that there was a return before it of the vote of Hanna Polling Precinct, it properly proceeded to canvass and make an abstract of that vote, with the vote of other precincts, and that the copy of that abstract was the proper official return of the vote of Carbon County, and that the State canvassing board should have accepted it as such, and that the State canvassing board is subject to control by mandamus in the discharge of such duty. Upon the overruling of demurrer of defendants to petition of relators, defendants filed their answer to the petition, and relators, in their turn, now demur to that answer. This answer and the demurrer thereto raise the further question, which is the question to be

decided now, of the competency or standing of relators to maintain their actions.

Each of relators alleges in his petition as part of his cause of action that he was regularly nominated by a convention of the Democratic party, that his nomination was duly certified in the manner required by law, and that certificates thereof were duly and regularly filed in the proper offices, and that his name was duly printed upon the official ballots. Defendants in their answer in each case deny that any nomination was ever duly or otherwise certified in the manner required by law or otherwise; and deny that any certificate thereof was ever duly or otherwise filed in the office of the county clerk of either of the counties of Carbon and Natrona. And defendants allege in each case that the name of relator was unlawfully printed upon the official ballots in said counties in this, that no certificate of nomination had ever been made or filed in any public office presenting the name of relator as a candidate; and that no votes were cast for the said relator in either of said counties in any other way than by placing a cross opposite the name of relator where the same was printed on the official ballots.

It is not necessary to state to lawyers that a demurrer admits the truth of the pleading demurred to. In ruling on defendants' demurrer to petition of relators, we were compelled to consider the statements in the petition as true. In ruling on this demurrer, we are compelled to consider the statements of the answer directly to the contrary effect as true.

The demurrer is general; that is, that the facts alleged are not sufficient to constitute a defense to the action.

In support of the demurrer, it is urged that the only questions that can be considered have already been determined; that is, that the State board of canvassers did not canvass the actual, legal return from Carbon County, and that they may be required by mandamus to do so. But the authorities are to the effect, with substantial unanimity, that a private individual, in order to entitle himself to a writ of mandamus in any case, must show a legal interest in himself in the result of the proposed action. The writ of mandamus is an extra-

ordinary remedy to be issued in the discretion of the court. The courts have never allowed the writ to run on the relation of a private individual, except such individual establish his standing in court by showing a subsisting legal interest in himself in the subject matter of the action. It is claimed by relators that admitting the answer to be true, such interest still appears in relators. On the contrary, it is urged by defendants that the answer if true shows that the election of relators is void, and, consequently, that they have no legal interest in the relief sought; and that the peremptory writ of mandamus asked of this court, compelling the State board of canvassers to issue to them certificates of election, would not be in aid of any legal right belonging to them, but would merely arm them with an instrument to aid them, in violation of law, to intrude into an office to which they are not entitled. Let it be understood, once for all, that this court cannot in this proceeding determine the ultimate right of relators to office as in an election contest. But this court is obliged to consider and determine, incidentally, though not finally, every question affecting the propriety of issuing its peremptory writ of mandamus.

Relators contend that the validity of their election cannot be considered in this action. In support of such contention, their attorneys cite the State ex rel. Piggott v. Board of Canvassers, 31 Pacific, 536 (Mont.); decided November 19, 1892. That was an action to restrain a board of canvassers from canvassing votes cast because of informality in the certificates of nomination of candidates. The court denied the writ. The decision is correct law according to the views already expressed by this court in this case. The canvassers in common but expressive language, cannot "go behind the returns," and should not be compelled to do so by mandamus. But this does not touch the question of the standing of relators in this court, or their right to maintain their actions. The case of The People ex rel. Henry Bradley et al. Respondents v. Thomas G. Shaw et al. Board of Canvassers, 133 N. Y., 493, is cited for relators. Relators were candidates for the several town offices of the Town of Minerva, Essex County. They

were voted for by means of paster ballots attached to the official ballots, as authorized by the statute law of New York. But the ballots had printed upon them the name of the candidate for excise commissioner, which the statute required to be on a separate ballot. The canvassers rejected the ballots entire. Held, error. The ballots could not be counted for the candidate for excise commissioner, his name not being legally on the ballot, but should have been counted for the candidates whose names were legally on the ballots. This case is not in favor of the contention of the relators. Allen v. Glynn, 29 Pacific, 670 (Colo.), is also cited. This was decided by a majority of the court, with a dissenting opinion by Helm, J., under the statute of Colorado known as the Australian ballot law. It differs from that of Wyoming in that it contains a provision that certificates of nomination shall be valid unless objected to in writing within three days after filing. Our statute contains no such provision. The case was a proceeding to contest the election of a district judge. Held, that having failed to object to an error in the printed ballot prior to election, contestant was not entitled to do so in the contest of the election. The error complained of resulted from the fact that the People's party of the Thirteenth Judicial District selected a different emblem from that chosen by the State convention of the People's party. It was claimed that the ballots under one of these emblems were irregular, and should be rejected in the contest suit. The ruling was as above stated.

The case of Bowers v. Smith, 20 S. W. Rep., 101 (Missouri), is also cited for relators. This was a proceeding by Bowers to contest the election of Smith, who received a plurality of the votes cast, to the office of sheriff of Pettis County. Contestant Bowers did not claim that defendant Smith's name was illegally printed on any official ballots. His claim was that the official ballots printed by the county clerk for use in the City of Sedalia contained among others the names of the nominees of the Union Labor party, and that party had not polled three per cent. of the entire vote at the last previous general election as required by statute to entitle them to have

the names of their candidates printed on the official ballot. Contestant contended that the entire vote of the City of Sedalia for all candidates should be rejected on this account. The court declined to do this. Another point was decided not material to the present discussion. The decision was merely to the effect that some names being illegally on the official ballot would not invalidate the vote as to names legally there. These are all the authorities which the very energetic and industrious counsel for relators have cited in their written brief. It will be seen that they affect but remotely the questions involved in the determination of this demurrer. In our investigations we have found no other authorities which seem to sustain the contention of relators. The case of State ex rel. Sherwood v. State Canvassers, 129 N. Y., 345, was referred to by counsel for relators in his oral argument. It is relied on by both parties. Relators rely upon the argument of the dissenting opinion. The defendants rely upon the decision of the court by a majority of its members of five to two. Sherwood was elected to an office to which he was ineligible under the constitution of New York, on account of holding a city office at the time of his election. He asked for a writ of mandamus to compel a canvass of votes and issuance of a certificate showing his election. He claimed that neither the canvassers nor the court could lawfully inquire into his eligibility in that action, but that it was incumbent on the court to compel such canvass without regard to the question of his ineligibility. It was admitted that the board of canvassers could not lawfully make such an inquiry, but it was held, in effect, that the court could and would do so in determining whether its writ of mandamus should run. And the decision of the court was to the effect that Sherwood, being ineligible to the office, had no legal interest in the canvass of the vote, and the court would not, by its peremptory mandamus, arm him with a certificate of election which could only aid him in intruding into an office to which he was not entitled. In State ex rel. Ensworth v. Albin, 44 Missouri, 346, the court refused to compel by mandamus the issue of a commission of judge to relator because, although elected thereto and eligible, neither his election or

eligibility being denied or questioned, his election was illegal in not being preceded by a registration of voters. The State ex rel. Snyder v. Newman et al., 91 Mo., 445, shows that the relator had been elected by a plurality of votes to the office of mayor of Pierce City. Defendants as canvassers so found by a canvass of the votes, but declined to direct the clerk to issue to him a certificate of election. The court refused its writ of mandamus to compel the certificate to issue. The court says: "As by virtue of his disqualification, the relator was not entitled to hold the office, surely he has no right, at the hand of the court, to be armed with a certificate of election-evidence of title to that to which he has no right." To a similar effect is the case of State ex rel. v. Williams, 99 Mo., 291; State ex rel. Crawford v. McGregor, 44 O. S., 628; State ex rel. O'Malley v. Leseur, 103 Mo., 253; Sherburne v. Horne, 45 Michigan, 160; Peters v. Board of Canvassers, 17 Kan., 365; State ex rel. Mitchell v. Stevens et al., 23 Kansas, 324; State ex rel. Crawford v. Robinson, 1 Kan., 25.

We have now to inquire, taking the statements as true that no certificate of the nomination of relators was ever made or filed, and that their names were consequently unlawfully printed upon the official ballots, and that no votes were cast for them in either Carbon or Natrona Counties in any other way or manner than by placing a cross (X) opposite their names, do these facts invalidate their election?

This involves the question as to what extent our statutory provisions are mandatory to the extent that they cannot be disregarded without invalidating elections held under them. These statutes, popularly known as the "Australian ballot law," are of comparatively recent introduction into the United States, and the decisions upon this point are very scarce. We can only avail ourselves of such assistance as these meager authorities give us in deciding this important question. It is a duty we would gladly be excused from, but cannot evade.

The cases of Allen v. Glynn and Bowers v. Smith, supra, have been sufficiently commented upon and distinguished from the case at bar. The case of the People ex rel. Nichols v. Board of Canvassers, 129 N. Y., 395, goes far in holding the

provisions of the statute as to the conduct of election matters to be mandatory in the strictest sense of the word. In this case, there was no question of the regularity of nominations, certificates thereof, or filing of such certificates, or of the correctness of the printed ballots. But the town clerk in transmitting the ballots to the different election districts, transposed those of one of the political parties so that those indorsed for one district were sent to another. It was held by a majority of the court, that such ballots should be rejected, and that mandamus would lie to compel the canvassers to reject them. But the case which has discussed this matter most thoroughly in the light of the English decisions, almost the only light in the way of authority available, as well as from considerations of the policy and intent of the law, is the case of Price v. Lush (Mont.), 24 Pac., 749. I cannot state the doctrine of the case in brief better than by quoting from the syllabus: "Though Section 15 allows a voter to write or paste on his ballot the name of any one he wishes to vote for, the official publication of the candidacy of one whose nomination is not duly made and certified, and the printing of his name on the ballots, give him an undue advantage, which will avoid his election." The strictness with which the English courts have held the provisions of the Australian ballot law to be mandatory is illustrated by a number of cases quoted in Price v. Lush. The case of Queen v. Parkinson, L. R. 3, Q. B., 11, decided in 1867, was a case in which a candidate's election was held void because he was nominated by one who was not a qualified elector. In case of Mather v. Brown, 1 C. P. Division, 599, decided in 1876, it was held, under a statute requiring a nomination paper to state the surname and other names of the persons nominated, that the name of Robert Vicars Mather appearing as Robert V. Mather was a fatal objection. Many other authorities from the courts of the country from which we have transplanted the Australian ballot law are quoted from in the case of Price v. Lush, supra. They are all of similar import, constituting a strong array in favor of construing the provisions of that law as strictly mandatory. It is not necessary to repeat the quotations here. It

may well be doubted whether the courts of this country will go as far in this direction as have the English courts. But it would seem that if the more important provisions of this law for securing purity in our elections are held not to be mandatory it will avoid the beneficial effect of the entire system. It may be that the court in People ex rel. Nicols v. Board of Canvassers, supra, went farther than other courts would be willing to go; but the objection to the ballots in this case is much more serious than in that. The case of Price v. Lush is directly in point. It is well sustained by authority and is likely to be the leading American case on this subject.

With the best light upon the matter within our reach, we feel constrained to overrule the demurrer.

Demurrer is overruled with leave to the relators to reply.

MERRELL, J., concurs.

GROESBECK, C. J., dissents.

---

### ON DEMURRER TO REPLY.

CONAWAY, JUSTICE.

This cause now assumes a new phase. The demurrers to the answer already decided were an admission of the truth of those answers.

They contained among other things allegations that the names of relators were unlawfully printed upon the official ballots, in that no certificates of their nomination had been filed. The court held in effect that the filing of such certificates was necessary, that the statute requiring such filing is mandatory, and that without the filing of such certificates relators' names could not lawfully be printed upon the official ballots, and if so unlawfully printed the election of relators would be invalidated. The demurrers of relators being overruled they filed their replies. These replies are now demurred

to and are to be taken as true in deciding the demurrers to them.

These replies allege that relators were duly nominated by a Democratic convention held at Rawlins in Carbon County on September 27th, 1892, as candidates for election to the House of Representatives to the Second Legislature of the State of Wyoming from said county, and that certificates of such nominations were duly filed as required by law. These certificates are exemplified by copy. They are precisely similar in form even as to every word, letter and punctuation mark. The following is one of them in full:

### "CERTIFICATE OF NOMINATION."

We, the undersigned, do hereby certify that S. B. Bennett, a resident of Baggs, Wyoming, whose business is stockgrower has been nominated for member of house of representatives, and that the convention making the nomination is Democratic.

| William Daly, | Rawlins, Wyo. |
| Chairman. | Residence. |
| F. P. Shannon, Secretary. | Carbon, Wyo. residence. |

State of Wyoming, }ss.
Carbon County. }

I, the undersigned, being duly sworn, do depose and say that I was the officer, I above represent myself to be the above named convention, and that the above certificate and the statements therein contained, are true to the best of my belief. So help me God.

William Daly, Chairman.          Rawlins, Wyo. residence.

Subscribed in my presence and sworn to before me this 11th. day of October, A. D. 1892.

Charles P. Hill, Notary Public.

State of Wyoming, }ss.
Carbon County, }

I, the undersigned, being duly sworn, do depose and say that I was the officer I above represent myself to be the

above named convention, and that the above certificate and the statements therein contained are true, to the best of my belief. So help me God.

F. P. Shannon, Secretary.    Carbon Wyo. residence.

Subscribed in my presence and sworn to before me this 12th. day of October, A. D. 1892.

Lou R. Meyer, Notary Public."

This is one of the certificates which are claimed by the defendants to be no certificates, or insufficient to answer the requirements of the law. The other is precisely like it. What we say of this one applies to both. Relators, on the contrary, claim that the objections to the certificates are merely formal and technical, and that the certificates do not fall short of the requirements of the law in any essential particular. Our election law, after providing that any convention or primary meeting may nominate candidates, proceeds as follows:

"Sec. 86. All nominations made by such convention or primary meeting shall be certified as follows: The certificate of nomination, which shall be in writing, shall contain the name of each person nominated, his residence, his business, and the office for which he is named; and shall designate in not more than five words the party or principle which such convention or primary meeting represents." Laws of 1890, p. 168.

It is objected to the certificate under consideration that it does not state that the nomination was made by an organized assemblage of electors or delegates representing a political party. This is not required to be stated in the certificate. It is sufficiently apparent from the certificate that the nomination was made by a convention. The statute defines the word "convention" as follows:

"Sec. 85. A convention or primary meeting within the meaning of this act is an organized assemblage of electors or delegates representing a political party." When the word "convention" is used, all this is meant and understood.

It is objected that the certificate does not show when or where the nomination was made. The statute does not re-

quire that it should.: It is objected that the certificate does not show what House of Representatives the nomination is for or for what county. It would seem that when this certificate became public by being filed by the county clerk of Carbon County in his office, there could be no danger of any misunderstanding on these points. The certificate might have been put in clearer terms, but it would seem not to be fatally obscure. The statute does not prescribe any form of words to be used.

Speaking of the certificate, the statute continues: "It shall be signed by the presiding officer and secretary of such convention or primary meeting who shall add to their signatures, their respective places of residence and make oath before an officer qualified to administer the same that the affiants were such officers of such convention or such primary meeting, and that said certificates and the statements therein contained are true to the best of their knowledge and belief. A certificate that such oath has been administered shall be made and signed by the officer before whom the same was taken." It is claimed that the affidavit to the certificate in question does not fulfill these requirements, but that it is seriously defective. It is true that it is seriously defective. Is this defect sufficient to render the certificate void? If it has this effect, then, by the great preponderance of authority, both English and American, relators had no right to have their names upon the official ballots and their election is invalid. This involves the inquiry to what extent the provisions of our election laws are mandatory as distinguished from directory. As intimated in our opinion on the demurrer to the answer of defendants, it seems that American courts are not disposed to enforce so strict a rule of construction as are the English courts.

A fair summing up of the result of American decisions is found in McCrary on Elections, Section 192: "The rule of construction to be gathered from all the authorities was thus stated in Jones v. State (1 Kan., 273) and approved in Gilleland v. Schuyler (9 Kan., 569): 'Unless a fair consideration of the statute shows that the legislature intended compliance with the provisions in relation to the manner to be

essential to the validity of the proceedings it is to be regarded as directory merely.' And in the latter case the court said: 'Questions affecting the purity of elections are in this country of vital importance. Upon them hangs the experiment of self-government. The problem is to secure first to the voter a free, untrammeled vote, and secondly a correct record and return of the vote. It is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. But these rules are only means. The end is the freedom and purity of the election. To hold these rules all mandatory and essential to a valid election is to subordinate substance to form, the end to the means. Yet, on the other hand, to permit a total neglect of all the requirements of the statute, and still sustain the proceedings, is to forego the lessons of experience and invite a disregard of all those provisions which the wisdom of years has found conducive to the purity of the ballot box. Ignorance, inadvertence, mistake or even intentional wrong on the part of local officials should not be permitted to disfranchise a district. Yet rules and uniformity of procedure are as essential to procure truth and exactness in elections as in anything else. Irregularities invite and conceal fraud.' If we keep in view these general principles and bear in mind that irregularities are generally to be disregarded, unless the statute expressly declares that they shall be fatal to the election, or unless they are such, in themselves, as to change or render doubtful the result, we shall find no great difficulty in determining each case as it arises under the various statutes of the several States."

These views are in no degree relaxed in more recent decisions arising under the Australian ballot law. It seems that there is a principle underlying these decisions which we have nowhere found stated in terms, but which would sound something like this. Whatever is an essential part of the system, or something without which the legislature would not have adopted the balance of the system, or is essential to the orderly working of the system according to the intent of the legislature, must be regarded as mandatory. At least this

much is mandatory. It may be that some things falling short of this description are also mandatory. But it is equally clear that some things are in the statute which merely directory. It is provided that ballots shall be printed at public expense. If the printer should neglect to collect his bill or should donate it to the county no one would claim that that would invalidate an election. It is provided that certificates of nomination shall be preserved for a year and shall be open to public inspection under proper regulations to be made by the officers with whom the same are filed. If such officer should make improper regulations no one would claim that that would invalidate an election. But it is entirely clear that the legislature never intended that county clerks should provide ballots and have the names of officers printed in them unless those names were certified to those clerks as required by statute. No such arbitrary power is vested in the clerk. The authority of the clerk is to "cause to be printed in the ballot the name of every candidate whose name has been certified to or filed with the clerk in the manner provided by this act." And further: "Ballots other than those printed by the respective county clerks according to the provisions of this act shall not be cast or counted in any election." If a county clerk prints or causes to be printed a ballot without having received any certificate showing the nomination of any candidate or candidates he does so without authority and illegally. Any name of any candidate which is placed on the official ballot without a certificate of his nomination having been received and filed by the county clerk is placed there without authority and illegally. The official ballot is evidence to the voters that the candidates whose names appear thereon are the nominees of their respective parties, and that the evidence of such nomination is on file where it can be inspected by any voter who desires to do so. If this is not the case, it is a deception and fraud upon the voter which is calculated to influence largely the vote and change the result of the election, and the candidate whose name is thus illegally placed upon the official ballot acquires thereby an unfair advantage to which

he is not entitled. And however great his majority his election is illegal and invalid. He acquires no right thereby to be protected or enforced by this court or any court by writ of mandamus or otherwise. This is according to the great preponderance of authorities both recent and of earlier date. But this is not such a case. Here appears a certificate of nomination intelligible though not unexceptionable in its terms; but sufficient to convey to the mind of the inquirer the information required in such an instrument. It comes from the proper source. It is made a matter of public record. It is not obscure or misleading in its terms. An election follows. There is no such defect in this instrument as could possibly affect the result of that election. There is no provision of the statute indicating an intent on the part of the legislature that the statute prescribing what the certificate should contain and how it should be verified is so mandatory that a mere formal defect, incapable of affecting the regular and orderly conducting of the election or its result, should invalidate an election. If such rigid and severe construction be adopted cases will continually arise of formal defects, harmless in their nature, insufficient to have any effect for good or ill, but which will necessitate new elections at considerable expense which the counties can illy afford. This is a case in which not only candidates and their partisan friends are interested, but the whole people are interested. Every county and every taxpayer in the State is interested. Such rigid construction would probably necessitate a new election in Carbon County at the present time. How many other counties would be similarly affected at present or in the future, we can not conjecture. It cannot be presumed that the legislature would enact any law intending any such calamitous results. It is to be presumed that the legislature intended to accomplish only what is reasonable and just and for the public good. An opposite result will not be allowed if it can fairly be avoided. At least it will not be affected by any doubtful construction of statutes. It results from these views that the demurrer to

the reply must be overruled. Defendants declining to defend further a peremptory writ of mandamus will issue.

MERRELL, J., concurs. GROESBECK, C. J., concurs in the result.

GROESBECK, CHIEF JUSTICE, concurring.

I dissented from the views of the majority of this court overruling the demurrer to the answer. It was sought by the answer, or return, to raise the question as to whether or not the nominations of the relators had been certified, or whether or not a proper certificate thereof had been duly filed with the proper officer. Although the petitions for the writ allege the nomination of the relators by a convention representing the Democratic party, as candidates for election to the House of Representatives to the Second Legislature for the legislative district composed of the counties of Carbon and Natrona, and that the nominations were duly certified in the manner required by law; the answer or return denies these facts. I do not think that these matters were properly in issue in this proceeding. It seems to me that it was not necessary to allege that the relators were nominated at all. The answers severally set up that "the said defendants allege that the name of the said relator was unlawfully printed upon the official ballots in the said counties of Carbon and Natrona as a candidate for the House of Representatives of said State for the district composed of said counties, in this, that no certificate of nomination has ever been made or filed in any public office presenting the name of said relator as a candidate or nominee for such office; and that the said defendants allege that no votes were cast for relator for said office in either of said counties in any other way or manner than by placing a cross (X) opposite the name of relator where the same was printed on the official ballots." This allegation was probably made for the purpose of showing that no elector voting for either of the relators had written his name on the official ballot, which is permitted by statute. Suppose this fact had been denied in the reply and an issue had been made

on this point. Can it be seriously contended that this court would have been compelled to direct testimony to be taken thereon or have all the ballots in these counties inspected? I think not. There are some limits to judicial inquiry and some presumptions that are so conclusive as to preclude such inquiry. In a proceeding like this, the inquiry should be directed to ascertain if the returns show that the relator has been elected. He has a right to have the votes cast for him returned, canvassed and counted as provided by law and in the manner prescribed by law. Each relator has shown himself entitled to this "clear legal right," and it was so held by this court on demurrer to the petition. Our statute defining mandamus is as follows: "Mandamus is a writ issued in the name of the territory (State) to an inferior tribunal, a corporation, board or person commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station." Rev. Stat. Wyo., Sec. 3073. This court held that the legal and proper returns from Carbon County of the votes cast for relators were not canvassed by the State board of canvassers. This duty that the law enjoins upon such board and which results from their office, trust and station, should be performed, and the relators have shown their clear legal right to its performance. The constitution has made each branch of the legislature the judges of elections, returns and qualifications of their members. The court can not invade this province. It can merely set in motion the machinery provided by law to ascertain who is entitled to the certificate of election. (Dissenting opinion of Finch and Andrews, Justices, in People ex rel. Sherwood v. State Board of Canvassers, 129 N. Y., 377.) The cases that announce a contrary opinion are based upon the ineligibility of the relator or upon the invalidity of the election at which he was elected, but neither of these questions are presented here. It is true that in the answer to one of the petitions it is alleged that relator Chapman was not a citizen of the United States at the time of filing such answer and never was a citizen. This allegation is insufficient as this impediment might be removed before the time fixed for his qualification

as a member of the House of Representatives. The constitutional provision applicable is that no person shall be a representative who is not a citizen of the United States. (Last clause of Section 2 of Art. III, Con. Wyo.) This objection was waived by counsel for respondents as the reply filed thereafter shows that such relator has become a citizen of the United States since the election and prior to the meeting of the legislature, by naturalization. All the cases cited bear upon the ineligibility of the relator or the invalidity of election and consequently have no application. The only questions are as to the fact of nomination and the sufficiency of the certificate of nominations. If these questions could be raised in this proceeding, I doubt that they should be considered. The case of Price v. Lush, 24 Pac., 749 (Montana), was relied upon in a former argument, but in that case the effect of the pleadings alone were considered in a contest for the office of justice of the peace in a regular contest proceeding where the trial court had full jurisdiction to hear and determine the cause. If it could be followed out in the case at bar it would result in establishing the strictest rule of construction in every provision of our election law. Although our statute is a very faithful copy of the Australian ballot law, I see no reason for adopting the construction of the British courts, which appears to be most rigid.

I do not see why this law should be more strictly construed than any other statute, or why different rules of construction from those invariably followed by the courts should be adopted in construing this statute. The rigid rule of construction adopted in England, as shown in the opinion in Price v. Lush, supra, is monstrous.

No American case, with the exception of the Montana case, has gone so far as to establish the doctrine that the failure of the officers of a political nominating convention to properly certify the facts required to be certified by statute, would deprive such a candidate of the office to which he was elected. The provisions of the statute in this respect is to my mind for the guidance of the officer who prepares the official ballot. The list of candidates must be published, and this is the notice.

to the electors at large of the nominations. While an officer charged with the duty of receiving, filing and preserving certificates of nominations might not be compelled to place the names of the candidates not certified or irregularly certified, upon the official ballot, yet if he does so, without objection, I think all inquiry should end there. Any other construction would operate to delude the unsuspecting voter, who has a right to assume, when he receives from the election judges a ballot, purporting to be an official ballot, that it is official and properly made out by the public agents designated by law for that purpose. Cases indeed might arise where an officer charged with this duty has acted fraudulently or corruptly in placing names on an official ballot, which have no right there, but the courts are open for the redress of such wrongs. Certificates of nomination are open to inspection and heavy penalties are provided for the infringement of the law by the official who is custodian of these certificates and who prepares and directs the printing of the official ballot. These are sufficient safeguards against fraud, ignorance or corruption on the part of the officers entrusted with these duties. If the law is to be rigidly construed and all of its provisions held mandatory relating to the conduct of the officers in preparing and distributing official ballots, many electors may be deprived of their votes without any fault or negligence on their part. (Dissenting opinions in People ex rel. Nichols v. Board of Canvassers, 129 N. Y., 433.) The record discloses that there were ten candidates only for the office of representatives voted for in Carbon County, which with Natrona County is entitled to five representatives in the lower branch of the legislature, and it is fair to presume that these nominations were made five from each of the great political parties, and that the electors could exercise their choice from these two lists by voting their party or personal preferences, unless they chose to write the name of some other person or persons on the ballots. In choosing between political nominations, therefore, the electors must have been restricted to these names on the printed official ballot. They had the right to do so, and they ought not now to have this right questioned. The names appearing

on the two official ballots are challenged for the first time in this court, for aught we know to the contrary. In my judgment it is too late to make that objection now. The ordinary. rules of waiver of legal objections, if not seasonably interposed, ought to apply here. While no provision is made by our statute for the correction, or determination, of the validity of certificates of nomination, there is a provision for the correction of an error or omission in the publication of names or the description of candidates nominated for office, or in the printing of ballots. The proper district court or the judge thereof may direct the correction to be made on application therefor, or the mistakes may be corrected by-the clerk on his own motion. Secs. 108-9, Election Law.

In some States statutory provision is made for objecting to the certificates within a fixed period after they have been filed, but no such provision is incorporated in our law. Yet, it seems but reasonable that provisions having been made for public inspection of the nominating certificates, which must be filed a certain period before election, ample time is afforded for making objections to them or the action of the officer in accepting or rejecting them, prior to their printing and distribution. It appears to me that all such matters would be reached in the courts where the statute is silent. If no objection is made, before the printing of the ballots, and certainly if none is made before the election, I do not think it could be made after the election, and thus operate to defeat the will of the people as expressed at the ballot box.

Our election law was undoubtedly designed to protect the elector from fraud, imposition, intimidation and debauchery; to make him absolutely free while exercising his choice for public servants. It was intended to secure honesty and freedom to the voter and to render ineffective his corruption. It was never intended to serve as a cloak for disfranchisement, and should not be so construed as to render it possible for an official to ignorantly or designedly mislead or disfranchise any elector; if such was the intention it would have been better if the law had never been enacted. It could be no improvement on former statutes which have been invariably con-

strued in such manner as to arrive at the intent of the elector, to ascertain the will of a sovereign people, and to cause obedience to that mandate when ascertained.

I have read with much interest and profit the case of Bowers v. Smith, 20 S. W., 101 (Missouri); Allen v. Glynn, 29 Pacific, 670 (Colorado), and I believe that the reasoning of the majority of the courts in those cases fairly applied to this case will sustain me in my views.

I concur in the result.